# SUGARMAN, ADMINISTRATOR, NEW YORK CITY HUMAN RESOURCES ADMINIS-TRATION, ET AL. *v.* DOUGALL ET AL.

No. 71–1222.   Argued January 8, 1973—Decided June 25, 1973

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, WHITE, MARSHALL, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, *post,* p. 649.

*Samuel A. Hirshowitz,* First Assistant Attorney General of New York, argued the cause for appellants. With him on the briefs were *Louis J. Lefkowitz,* Attorney

General, and *Judith A. Gordon,* Assistant Attorney General.

*Lester Evens* argued the cause and filed a brief for appellees.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Section 53 (1) of the New York Civil Service Law reads:

"Except as herein otherwise provided, no person shall be eligible for appointment for any position in the competitive class unless he is a citizen of the United States." [1]

---

*J. Shane Creamer,* Attorney General, and *James R. Adams,* Deputy Attorney General, filed a brief for the Commonwealth of Pennsylvania as *amicus curiae* urging affirmance.

[1] The restriction has its statutory source in Laws of New York, 1939, c. 767, § 1. We are advised that the legislation was declarative of an administrative practice that had existed for many years. Tr. of Oral Arg. 43, 45.

Section 53 (2) of N. Y. Civ. Serv. Law (Supp. 1972–1973) makes a temporary exception to the citizenship requirement:

"2. Notwithstanding any of the provisions of this chapter or of any other law, whenever a department head or appointing authority deems that an acute shortage of employees exists in any particular class or classes of positions by reason of a lack of a sufficient number of qualified personnel available for recruitment, he may present evidence thereof to the state or municipal civil service commission having jurisdiction which, after due inquiry, may determine the existence of such shortage and waive the citizenship requirement for appointment to such class or classes of positions. The state commission or such municipal commission, as the case may be, shall annually review each such waiver of the citizenship requirement, and shall revoke any such waiver whenever it finds that a shortage no longer exists. A non-citizen appointed pursuant to the provisions of this section shall not be eligible for continued employment unless he diligently prosecutes the procedures for citizenship."

It is to be observed that an appointment under this exception permits the alien to continue his employment only until, on annual

The four appellees, Patrick McL. Dougall, Esperanza Jorge, Teresa Vargas, and Sylvia Castro, are federally registered resident aliens. When, because of their alienage, they were discharged in 1971 from their competitive civil service positions with the city of New York, the appellees instituted this class action challenging the constitutionality of § 53. The named defendants, and appellants here, were the Administrator of the city's Human Resources Administration (HRA), and the city's Director of Personnel and Chairman of its Civil Service Commission. The appellees sought (1) a declaration that the statute was invalid under the First and Fourteenth Amendments, (2) injunctive relief against any refusal, on the ground of alienage, to appoint and employ the appellees, and all persons similarly situated, in civil service positions in the competitive class, and (3) damages for lost earnings. A defense motion to dismiss for want of jurisdiction was denied by Judge Tenney, 330 F. Supp. 265 (SDNY 1971). A three-judge court was convened. That court ruled that the statute was violative of the Fourteenth Amendment and the Supremacy Clause, and granted injunctive relief. 339 F. Supp. 906 (SDNY 1971).[2] Judge Lumbard joined the court's opinion and judgment, but wrote separately in concurrence. *Id.*, at 911. Probable jurisdiction was noted. 407 U. S. 908 (1972).

---

review, it is deemed that "a shortage no longer exists." And, in any event, the alien "shall not be eligible for continued employment unless he diligently prosecutes the procedures for citizenship."

[2] The court found jurisdiction in the Civil Rights Statutes, 28 U. S. C. §§ 1343 (3) and (4). 339 F. Supp. 906, 907 n. 5. It held that the suit was properly maintainable as a class action and defined the class as consisting of "all permanent resident aliens residing in New York State who, but for the enforcement of Section 53, would otherwise be eligible to compete for employment in the competitive class of Civil Service." *Id.*, at 907 n. 4.

## I

Prior to December 28, 1970, the appellees were employed by nonprofit organizations that received funds through HRA from the United States Office of Economic Opportunity. These supportive funds ceased to be available about that time and the organizations, with approximately 450 employees, including the appellees and 16 other noncitizens, were absorbed by the Manpower Career and Development Agency (MCDA) of HRA.[3] The appellant Administrator advised the transferees that they would be employed by the city.[4] The appellees in fact were so employed in MCDA. In February, however, they were informed that they were ineligible for employment by the city and that they would be dismissed under the statutory mandate of § 53 (1). Shortly thereafter, they were discharged from MCDA solely because of their alienage.[5]

Appellee Dougall was born in Georgetown, Guyana, in September 1927. He has been a resident of New York City since 1964. He was employed by MCDA as an administrative assistant in the staff Development Unit.

Appellee Jorge was born in November 1948 in the Dominican Republic. She has been a resident of New

---

[3] Affidavit of Harold O. Basden, Director of Personnel of the Human Resources Administration, App. 31–33.

[4] Section 45 of the New York Civil Service Law, applicable to employees of a private institution acquired by the State or a public agency, contains a restriction, similar to that in § 53 (1), against the employment of an alien in a position classified in the competitive class.

[5] The appellants in their answer alleged that appellee Castro was terminated for the additional reason that she lacked sufficient experience to qualify for the position of senior human resources technician. App. 49. The three-judge court in its order, App. 93, excluded appellee Castro from the recognized class. That exclusion is not contested here.

York City since 1967. She was employed by the Puerto Rican Forum as a clerk-typist and, later, as a human resources technician. She worked in the latter capacity for MCDA.

Appellee Vargas was born in the Dominican Republic in June 1946. She has been a resident of New York City since 1963. She worked as a clerk-typist for the Puerto Rican Forum and in the same capacity for MCDA.

Appellee Castro was born in El Salvador in June 1944. She has resided in New York City since 1967. She was employed by the Puerto Rican Forum as an assistant counselor and then as a human resources technician and worked in the latter capacity for MCDA.

The record does not disclose that any of the four appellees ever took any step to attain United States citizenship.

The District Court, in reaching its conclusion that § 53 was unconstitutional under the Fourteenth Amendment, placed primary reliance on this Court's decisions in *Graham* v. *Richardson,* 403 U. S. 365 (1971), and *Takahashi* v. *Fish Comm'n,* 334 U. S. 410 (1948), and, to an extent, on *Purdy & Fitzpatrick* v. *State,* 71 Cal. 2d 566, 456 P. 2d 645 (1969). On the basis of these cases, the court also concluded that § 53 was in conflict with Congress' comprehensive regulation of immigration and naturalization because, in effect, it denied appellees entrance to, and abode in, New York. Accordingly, the court held, § 53 encroached upon an exclusive federal power and was constitutionally impermissible under Art. VI, cl. 2, of the Constitution.

## II

As is so often the case, it is important at the outset to define the precise and narrow issue that is here presented. The Court is faced only with the question

whether New York's flat statutory prohibition against the employment of aliens in the competitive classified civil service is constitutionally valid. The Court is not asked to decide whether a particular alien, any more than a particular citizen, may be refused employment or discharged on an individual basis for whatever legitimate reason the State might possess..

Neither is the Court reviewing a legislative scheme that bars some or all aliens from closely defined and limited classes of public employment on a uniform and consistent basis. The New York scheme, instead, is indiscriminate. The general standard is enunciated in the State's Constitution, Art. V, § 6, and is to the effect that appointments and promotions in the civil service "shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive." In line with this rather flexible constitutional measure, the classified service is divided by statute into four classes. New York Civil Service Law § 40. The first is the exempt class. It includes, generally, the higher offices in the state executive departments, certain municipal officers, certain judicial employees, and positions for which a competitive or noncompetitive examination may be found to be impracticable. The exempt class contains no citizenship restriction whatsoever. § 41. The second is the noncompetitive class. This includes positions, not otherwise classified, for which a noncompetitive examination would be practicable. There is no citizenship requirement. § 42. The third is the labor class. This includes unskilled laborers holding positions for which competitive examinations would be impracticable. No alienage exclusion is imposed. § 43. The fourth is the competitive class with which we are here concerned. This includes all positions for which it is practicable to determine merit and fitness by a competitive examination.

§ 44. Only citizens of the United States may hold positions in this class. § 53. The limits of these several classes, particularly the competitive class from which the appellees were deemed to be disqualified, are not readily defined. It would appear, however, that, consistent with the broad scope of the cited constitutional provision, the competitive class reaches various positions in nearly the full range of work tasks, that is, all the way from the menial to the policy making.

Apart from the classified civil service, New York has an unclassified service. § 35. This includes, among others, all elective offices, offices filled by legislative appointment, employees of the legislature, various offices filled by the Governor, and teachers. No citizenship requirement is present there.

Other constitutional and statutory citizenship requirements round out the New York scheme. The constitution of the State provides that voters, Art. II, §1, members of the legislature, Art. III, § 7, the Governor and Lieutenant-Governor, Art. IV, § 2, and the Comptroller and Attorney-General, Art. V, § 1, are to be United States citizens. And Public Officers Law § 3 requires that any person holding "a civil office" be a citizen of the United States. A "civil office" is apparently one that "possesses any of the attributes of a public officer or . . . involve[s] some portion of the soverign [sic] power." 1967 Op. N. Y. Atty. Gen. 60; *New York Post Corp.* v. *Moses*, 12 App. Div. 2d 243, 250, 210 N. Y. S. 2d 88, 95, rev'd on other grounds, 10 N. Y. 2d 199, 176 N. E. 2d 709 (1961).

We thus have constitutional provisions and a number of statutes that, together, constitute New York's scheme for the exclusion of aliens from public employment. The present case concerns only § 53 of the Civil Service Law. The section's constitutionality, however, is to be judged in the context of the State's broad statutory framework and the justifications the State presents.

## III

It is established, of course, that an alien is entitled to the shelter of the Equal Protection Clause. *Graham* v. *Richardson,* 403 U. S. 365, 371 (1971); *Truax* v. *Raich,* 239 U. S. 33, 39 (1915); *Wong Wing* v. *United States,* 163 U. S. 228, 238 (1896); *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (1886). See *In re Griffiths, post,* p. 717. This protection extends, specifically, in the words of Mr. Justice Hughes, to aliens who "work for a living in the common occupations of the community." *Truax* v. *Raich,* 239 U. S., at 41.

A. Appellants argue, however, that § 53 does not violate the equal protection guarantee of the Fourteenth Amendment because the statute "establishes a generic classification reflecting the special requirements of public employment in the career civil service." [6] The distinction drawn between the citizen and the alien, it is said, "rests on the fundamental concept of identity between a government and the members, or citizens, of the state." [7] The civil servant "participates directly in the formulation and execution of government policy," and thus must be free of competing obligations to another power.[8] The State's interest in having an employee of undivided loyalty is substantial, for obligations attendant upon foreign citizenship "might impair the exercise of his judgment or jeopardize public confidence in his objectivity." [9] Emphasis is placed on our decision in *United Public Workers* v. *Mitchell,* 330 U. S. 75 (1947), upholding the Hatch Act and its proscription of political activity by certain public employees, and it is said that the public employer "has broad discretion to establish quali-

---

[6] Brief for Appellants 17.

[7] *Id.,* at 22.

[8] *Id.,* at 23.

[9] *Ibid.*

fications for its employees related to the integrity and efficiency of the operations of government." [10]

It is at once apparent, however, that appellants' asserted justification proves both too much and too little. As the above outline of the New York scheme reveals, the State's broad prohibition of the employment of aliens applies to many positions with respect to which the State's proffered justification has little, if any, relationship. At the same time, the prohibition has no application at all to positions that would seem naturally to fall within the State's asserted purpose. Our standard of review of statutes that treat aliens differently from citizens requires a greater degree of precision.

In *Graham* v. *Richardson,* 403 U. S., at 372, we observed that aliens as a class "are a prime example of a 'discrete and insular' minority (see *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153, n. 4 (1938))," and that classifications based on alienage are "subject to close judicial scrutiny." And as long as a quarter century ago we held that the State's power "to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits." *Takahashi* v. *Fish Comm'n,* 334 U. S., at 420. We therefore look to the substantiality of the State's interest in enforcing the statute in question, and to the narrowness of the limits within which the discrimination is confined.

Applying this standard to New York's purpose in confining civil servants in the competitive class to those persons who have no ties of citizenship elsewhere, § 53 does not withstand the necessary close scrutiny. We recognize a State's interest in establishing its own form of government, and in limiting participation in that government to those who are within "the basic conception of a political community." *Dunn* v. *Blumstein,* 405

---

[10] *Id.,* at 13.

U. S. 330, 344 (1972). We recognize, too, the State's broad power to define its political community. But in seeking to achieve this substantial purpose, with discrimination against aliens, the means the State employs must be precisely drawn in light of the acknowledged purpose.

Section 53 is neither narrowly confined nor precise in its application. Its imposed ineligibility may apply to the "sanitation man, class B," *Perotta* v. *Gregory*, 4 Misc. 2d 769, 158 N. Y. S. 2d 221 (1957), to the typist, and to the office worker, as well as to the person who directly participates in the formulation and execution of important state policy. The citizenship restriction sweeps indiscriminately. Viewing the entire constitutional and statutory framework in the light of the State's asserted interest, the great breadth of the requirement is even more evident. Sections 35 and 41 of the Civil Service Law, relating generally to persons holding elective and high appointive offices, contain no citizenship restrictions. Indeed, even § 53 permits an alien to hold a classified civil service position under certain circumstances. In view of the breadth and imprecision of § 53 in the context of the State's interest, we conclude that the statute does not withstand close judicial scrutiny.

B. Appellants further contend, however, that the State's legitimate interest is greater than simply limiting to citizens those high public offices that have to do with the formulation and execution of state policy. Understandably relying on this Court's decisions in *Crane* v. *New York*, 239 U. S. 195 (1915), *Heim* v. *McCall*, 239 U. S. 175 (1915), and *Clarke* v. *Deckebach*, 274 U. S. 392 (1927), appellants argue that a State constitutionally may confine public employment to citizens. Mr. Justice (then Judge) Cardozo accepted this "special public interest" argument because of the State's concern with "the restriction of the resources of the state

644

to the advancement and profit of the members of the state." *People* v. *Crane,* 214 N. Y. 154, 161, 108 N. E. 427, 429, aff'd, 239 U. S. 195 (1915). We rejected that approach, however, in the context of public assistance in *Graham,* where it was observed that "the special public interest doctrine was heavily grounded on the notion that '[w]hatever is a privilege, rather than a right, may be made dependent upon citizenship.' *People* v. *Crane* . . . . But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' " 403 U. S., at 374. See also *Sherbert* v. *Verner,* 374 U. S. 398, 404 (1963); *Shapiro* v. *Thompson,* 394 U. S. 618, 627 n. 6 (1969); *Goldberg* v. *Kelly,* 397 U. S. 254, 262 (1970); *Bell* v. *Burson,* 402 U. S. 535, 539 (1971).

Appellants argue that our rejection of the special-public-interest doctrine in a public assistance case does not require its rejection here. That the doctrine has particular applicability with regard to public employment is demonstrated, according to appellants, by the decisions in *Crane* and *Heim* that upheld, under Fourteenth Amendment challenge, those provisions of the New York Labor Law that confined employment on public works to citizens of the United States.[11] See M. Konvitz, The Alien and the Asiatic in American Law, c. 6 (1946).

---

[11] In the past, the Court has invoked the special-public-interest doctrine to uphold statutes that, in the absence of overriding treaties, limit the right of noncitizens to exploit a State's natural resources, *McCready* v. *Virginia,* 94 U. S. 391 (1877), *Patsone* v. *Pennsylvania,* 232 U. S. 138 (1914); to inherit real property, *Hauenstein* v. *Lynham,* 100 U. S. 483 (1880), *Blythe* v. *Hinckley,* 180 U. S. 333 (1901); and to acquire and own land, *Terrace* v. *Thompson,* 263 U. S. 197 (1923), *Porterfield* v. *Webb,* 263 U. S. 225 (1923), *Webb* v. *O'Brien,* 263 U. S. 313 (1923), *Frick* v. *Webb,* 263 U. S. 326 (1923); but see *Oyama* v. *California,* 332 U. S. 633 (1948).

We perceive no basis for holding the special-public-interest doctrine inapplicable in *Graham* and yet applicable and controlling here. A resident alien may reside lawfully in New York for a long period of time. He must pay taxes. And he is subject to service in this country's Armed Forces. 50 U. S. C. App. § 454 (a). See *Astrup* v. *Immigration Service,* 402 U. S. 509 (1971). The doctrine, rooted as it is in the concepts of privilege and of the desirability of confining the use of public resources, has no applicability in this case. To the extent that *Crane, Heim,* and *Clarke* intimate otherwise, they were weakened by the decisions in *Takahashi* and *Graham,* and are not to be considered as controlling here.

C. The State would tender other justifications for § 53's bar to employment of aliens in the competitive civil service. It is said that career civil service is intended for the long-term employee, and that the alien, who is subject to deportation and, as well, to conscription by his own country, is likely to remain only temporarily in a civil service position. We fully agree with the District Court's response to this contention:

> "There is no offer of proof on this issue and [appellants] would be hard pressed to demonstrate that a permanent resident alien who has resided in New York or the surrounding area for a number of years, as have [appellees], and whose family also resides here, would be a poorer risk for a career position in *New York* . . . than an American citizen who, prior to his employment with the City or State, had been residing in another state." 339 F. Supp., at 909.

Appellants further assert that employment of aliens in the career civil service would be inefficient, for when aliens eventually leave their positions, the State will

have the expense of hiring and training replacements. Even if we could accept the premise underlying this argument—that aliens are more likely to leave their work than citizens—and assuming that this rationale could be logically confined to the classified competitive civil service, the State's suggestion does not withstand examination. As we stated in *Graham,* noting the general identity of an alien's obligations with those of a citizen, the " 'justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens.' "  403 U. S., at 376.

We hold that § 53, which denies all aliens the right to hold positions in New York's classified competitive civil service, violates the Fourteenth Amendment's equal protection guarantee.[12]

Because of this conclusion, we need not reach the issue whether the citizenship restriction is in conflict with Congress' comprehensive regulation of immigration and naturalization.  See *Graham* v. *Richardson,* 403 U. S., at 376–380.

## IV

While we rule that § 53 is unconstitutional, we do not hold that, on the basis of an individualized determination, an alien may not be refused, or discharged from,

[12] We are aware that citizenship requirements are imposed in certain aspects of the federal service.  See 5 U. S. C. § 3301; Exec. Order No. 10577, 19 Fed. Reg. 7521, § 2.1 (1954); 5 CFR §§ 338.101, 302.203 (g) (1973); and, for example, Treasury, Postal Service, and General Government Appropriation Act, 1972, § 602, Pub. L. 92–49, 85 Stat. 122, and Public Works Appropriations Act, 1971, § 502, Pub. L. 91–439, 84 Stat. 902.  In deciding the present case, we intimate no view as to whether these federal citizenship requirements are or are not susceptible of constitutional challenge. See *Jalil* v. *Hampton,* 148 U. S. App. D. C. 415, 460 F. 2d 923, cert. denied, 409 U. S. 887 (1972); Comment, Aliens and the Civil Service: A Closed Door?, 61 Geo. L. J. 207 (1972).

public employment, even on the basis of noncitizenship, if the refusal to hire, or the discharge, rests on legitimate state interests that relate to qualifications for a particular position or to the characteristics of the employee. We hold only that a flat ban on the employment of aliens in positions that have little, if any, relation to a State's legitimate interest, cannot withstand scrutiny under the Fourteenth Amendment.

Neither do we hold that a State may not, in an appropriately defined class of positions, require citizenship as a qualification for office. Just as "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections," *Oregon* v. *Mitchell,* 400 U. S. 112, 124–125 (1970) (footnote omitted) (opinion of Black, J.); see *id.,* at 201 (opinion of Harlan, J.), and *id.,* at 293–294 (opinion of STEWART, J.), "[e]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." *Boyd* v. *Thayer,* 143 U. S. 135, 161 (1892). See *Luther* v. *Borden,* 7 How. 1, 41 (1849); *Pope* v. *Williams,* 193 U. S. 621, 632–633 (1904). Such power inheres in the State by virtue of its obligation, already noted above, "to preserve the basic conception of a political community." *Dunn* v. *Blumstein,* 405 U. S., at 344. And this power and responsibility of the State applies, not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government. There, as Judge Lumbard phrased it in his separate concurrence, is "where citizenship bears some rational relationship to the special demands of the particular position." 339 F. Supp., at 911.

We have held, of course, that such state action, particularly with respect to voter qualifications, is not wholly immune from scrutiny under the Equal Protection Clause. See, for example, *Kramer* v. *Union School District,* 395 U. S. 621 (1969). But our scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives. *Id.,* at 625; *Carrington* v. *Rash,* 380 U. S. 89, 91 (1965). This is no more than a recognition of a State's historical power to exclude aliens from participation in its democratic political institutions, *Pope* v. *Williams,* 193 U. S., at 632–634; *Boyd* v. *Thayer,* 143 U. S., at 161, and a recognition of a State's constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders.[13] U. S. Const. Art. IV, § 4; U. S. Const. Amdt. X; *Luther* v. *Borden, supra;* see *In re Duncan,* 139 U. S. 449, 461 (1891). This Court has never held that aliens have a constitutional right to vote or to hold high public office under the Equal

---

[13] In congressional debates leading to the adoption of the Fourteenth Amendment, there is clear evidence that Congress not only knew that as a matter of local practice aliens had not been granted the right to vote, but that under the amendment they did not receive a constitutional right of suffrage or a constitutional right to participate in the political process of state government, and that, indeed, the right to vote and the concomitant right of participation in the political process were matters of local law. Cong. Globe, 39th Cong., 1st Sess., 141–142, 2766–2767 (1866).

It is noteworthy, as well, that the 40th Congress considered and very nearly proposed a version of the Fifteenth Amendment that expressly would have prohibited discriminatory qualifications not only for voting but also for holding office. The provision was struck in conference. It is evident from the debate that, for whatever motive, its opponents wanted the States to retain control over the qualifications for office. Cong. Globe, 40th Cong., 3d Sess., at 1425–1426, 1623–1633 (1869). And, of course, the Fifteenth Amendment applies by its terms only to "citizens."

Protection Clause. Indeed, implicit in many of this Court's voting rights decisions is the notion that citizenship is a permissible criterion for limiting such rights. *Kramer* v. *Union School District,* 395 U. S., at 625; *Reynolds* v. *Sims,* 377 U. S. 533, 567, 568 (1964); *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 666–667 (1966); *Carrington* v. *Rash,* 380 U. S., at 91, 93–94, 96; *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, 50–51 (1959); *Mason* v. *Missouri,* 179 U. S. 328, 335 (1900). A restriction on the employment of noncitizens, narrowly confined, could have particular relevance to this important state responsibility, for alienage itself is a factor that reasonably could be employed in defining "political community."

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE REHNQUIST, dissenting.*

The Court in these two cases holds that an alien is not really different from a citizen, and that any legislative classification on the basis of alienage is "inherently suspect". The Fourteenth Amendment, the Equal Protection Clause of which the Court interprets as invalidating the state legislation here involved, contains no language concerning "inherently suspect classifications," or, for that matter, merely "suspect classifications." The principal purpose of those who drafted and adopted the Amendment was to prohibit the States from invidiously discriminating by reason of race, *Slaughter-House Cases,* 16 Wall. 36 (1873), and, because of this plainly manifested intent, classifications based on race have rightly been held "suspect" under the Amendment. But there is no language used in the Amendment, or any

---

*This opinion applies also to No. 71–1336, *In re Griffiths, post,* p. 717.

historical evidence as to the intent of the Framers, which would suggest to the slightest degree that it was intended to render alienage a "suspect" classification, that it was designed in any way to protect "discrete and insular minorities" other than racial minorities, or that it would in any way justify the result reached by the Court in these two cases.

Two factual considerations deserve more emphasis than accorded by the Court's opinions. First, the records in Nos. 71–1222 and 71–1336 contain no indication that the aliens suffered any disability that precluded them, either as a group or individually, from applying for and being granted the status of naturalized citizens. The appellees in No. 71–1222, as far as the record discloses, took no steps to obtain citizenship or indicate any affirmative desire to become citizens. In No. 71–1336, appellant was eligible for naturalization but "elected to remain a citizen of the Netherlands," 162 Conn. 249, 250, 294 A. 2d 281, 282, and deliberately chose not to file a declaration of intent under 8 U. S. C. §§ 1427 (f), 1430 (a). The "status" of these individuals was not, therefore, one with which they were forever encumbered; they could take steps to alter it when and if they chose.[1]

Second, the appellees in No. 71–1222 all sought to be employees of administrative agencies of the New York City government. Of the 20 members of the class repre-

---

[1] Although some of the members of the class had not been residents of the United States for five years at the time the complaint was filed, and therefore were ineligible to apply immediately for citizenship, 8 U. S. C. § 1427, there is no indication that these members, assuming that they are in the same "class" as the named appellees, would be prohibited from seeking citizenship status after they had resided in this country for the required period. In any event, this circumstance only underscores the fact that it is not unreasonable to assume that they have not learned about and adapted to our mores and institutions to the same extent as one who had lived here for five years would have through social contact.

sented by the named appellees, three were typists, one a "senior clerk," two "human resources technicians," three "senior human resources technicians," six "human resource specialists," three "senior human resources specialists," and two "supervising human resource specialists." The record does not reveal what functions are performed by these civil servants, although appellee Dougall apparently was the chief administrator of a program; the remaining appellees were all employees of the New York City Human Resources Administration, the governmental body with numerous employees which administers many types of social welfare programs, spending a great deal of money and dealing constantly with the public and other arms of the federal, state, and local governments.

## I

The Court, by holding in these cases and in *Graham* v. *Richardson,* 403 U. S. 365 (1971), that a citizen-alien classification is "suspect" in the eyes of our Constitution, fails to mention, let alone rationalize, the fact that the Constitution itself recognizes a basic difference between citizens and aliens. That distinction is constitutionally important in no less than 11 instances in a political document noted for its brevity. Representatives, U. S. Const. Art. I, § 2, cl. 2, and Senators, Art. I, § 3, cl. 3, must be citizens. Congress has the authority "[t]o establish an uniform Rule of Naturalization" by which aliens can become citizen members of our society, Art. I, § 8, cl. 4; the judicial authority of the federal courts extends to suits involving citizens of the United States "and foreign States, Citizens or Subjects," Art. III, § 2, cl. 1, because somehow the parties are "different," a distinction further made by the Eleventh Amendment; the Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments are relevant only to "citizens." The President must not only be a citizen but "a natural born

Citizen," Art. II, § 1, cl. 5. One might speculate what meaning Art. IV, § 2, cl. 1, has today.

Not only do the numerous classifications on the basis of citizenship that are set forth in the Constitution cut against both the analysis used and the results reached by the Court in these cases; the very Amendment which the Court reads to prohibit classifications based on citizenship establishes the very distinction which the Court now condemns as "suspect." The first sentence of the Fourteenth Amendment provides:

> "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

In constitutionally defining who is a citizen of the United States, Congress obviously thought it was doing something, and something important. Citizenship meant something, a status in and relationship with a society which is continuing and more basic than mere presence or residence. The language of that Amendment carefully distinguishes between "persons" who, whether by birth or naturalization, had achieved a certain status, and "persons" in general. That a "citizen" was considered by Congress to be a rationally distinct subclass of all "persons" is obvious from the language of the Amendment.

It is unnecessary to venture into a detailed discussion of what Congress intended by the Citizenship Clause of the Fourteenth Amendment. The paramount reason was to amend the Constitution so as to overrule explicitly the *Dred Scott* decision. *Scott* v. *Sandford,* 19 How. 393 (1857). Our decisions construing "the privileges or immunities of citizens of the United States" are not irrelevant to the question now before the Court, insofar as they recognize that there are attributes peculiar to

the status of federal citizenship. See, *e. g., Slaughter-House Cases,* 16 Wall., at 79; *United States* v. *Cruikshank,* 92 U. S. 542 (1876); *Ex parte Yarbrough,* 110 U. S. 651 (1884); *Crutcher* v. *Kentucky,* 141 U. S. 47 (1891); *Logan* v. *United States,* 144 U. S. 263 (1892); *In re Quarles,* 158 U. S. 532 (1895). Cf. *Crandall* v. *Nevada,* 6 Wall. 35 (1868). Decisions of this Court holding that an alien is a "person" within the meaning of the Equal Protection Clause of the Fourteenth Amendment are simply irrelevant to the question of whether that Amendment prohibits legislative classifications based upon this particular status. Since that Amendment by its own terms first defined those who had the status as a lesser included class of all "persons," the Court's failure to articulate why such classifications under the same Amendment are now forbidden serves only to illuminate the absence of any constitutional foundation for these instant decisions.

This Court has held time and again that legislative classifications on the basis of citizenship were subject to the rational-basis test of equal protection, and that the justifications then advanced for the legislation were rational. See *Clarke* v. *Deckebach,* 274 U. S. 392 (1927); *Terrace* v. *Thompson,* 263 U. S. 197 (1923); *Porterfield* v. *Webb,* 263 U. S. 225 (1923); *Webb* v. *O'Brien,* 263 U. S. 313 (1923); *Frick* v. *Webb,* 263 U. S. 326 (1923); *Patsone* v. *Pennsylvania,* 232 U. S. 138 (1914); *Blythe* v. *Hinckley,* 180 U. S. 333 (1901); *Hauenstein* v. *Lynham,* 100 U. S. 483 (1880).

This Court explicitly held that it was not a violation of the Equal Protection Clause for a State by statute to limit employment on public projects to citizens. *Heim* v. *McCall,* 239 U. S. 175 (1915); *Crane* v. *New York,* 239 U. S. 195 (1915). Even if the Court now considers that the *justifications* for those enactments are

"not controlling," those decisions clearly hold that the rational-basis test applies.

To reject the methodological approach of these decisions, the Court now relies in part on the decisions in *Truax* v. *Raich,* 239 U. S. 33 (1915), and *Takahashi* v. *Fish Comm'n,* 334 U. S. 410 (1948). In *Truax, supra,* the Court invalidated a state statute which prohibited employers of more than five persons from employing more than 20% noncitizens. The law was applicable to all businesses. In holding that the law was invalid under the Equal Protection Clause, the Court took pains to explain that the decision was not meant to disturb prior holdings, 239 U. S., at 39, and specifically noted that "it should be added that the act is not limited to persons who are engaged on public work or receive the benefit of public moneys." *Id.,* at 40. Indeed, *Heim* and *Crane* were decided after *Truax,* as was *Clarke,* which held that a State could constitutionally prohibit aliens from engaging in certain types of businesses. If anything, *Truax* was limited by these later decisions.

*Takahashi, supra,* involved a statute which prohibited aliens "ineligible for citizenship" under federal law from receiving commercial fishing licenses. A State whose classification on the basis of race would have been legitimately "suspect" under the Fourteenth Amendment was in effect using Congress' power to classify in granting or withholding citizenship. The Court did not countenance this attempt at discrimination on the basis of race "by incorporation." Two features of that law should be noted. First, the statutory classification was not one involving citizens and aliens; it classified citizens and those resident aliens eligible for citizenship into one group, and resident aliens ineligible for citizenship into another. No reason for discriminating among resident aliens is apparent. Second, and most impor-

tant, is the fact that, although the Court properly refused to inquire into the legislative motive, the overwhelming *effect* of the law was to bar resident aliens of Japanese ancestry from procuring fishing licenses. The Court was not blind to this fact, or to history. See 334 U. S., at 412 n. 1, 413. The state statute that classifies aliens on the basis of country of origin is much more likely to classify on the basis of race, and thus conflict with the core purpose of the Equal Protection Clause, than a statute that, as here, merely distinguishes between alienage as such and citizenship as such. *Takahashi* did not, however, overrule previous decisions, and certainly announced no "suspect classification" rule with regard to citizen-alien classifications. To say that it did evades rather than confronts precedent.

The third, and apparently paramount, "decision" upon which the Court relied in *Graham,* and which is merely quoted in the instant decisions, is a footnote from *United States* v. *Carolene Products Co.,* 304 U. S. 144 (1938), a case involving a federal statute prohibiting the interstate shipment of filled milk. That footnote discussed the presumption of constitutionality of statutes and stated:

> "Nor need we enquire whether similar considerations enter into the review of statutes directed at particular religious, *Pierce* v. *Society of Sisters,* 268 U. S. 510, or national, *Meyer* v. *Nebraska,* 262 U. S. 390; *Bartels* v. *Iowa,* 262 U. S. 404; *Farrington* v. *Tokushige,* 273 U. S. 284, or racial minorities, *Nixon* v. *Herndon,* [273 U. S. 536]; *Nixon* v. *Condon,* [286 U. S. 73]; whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a

correspondingly more searching judicial inquiry."
*Id.*, at 152–153, n. 4.

On the "authority" of this footnote, which only four Members of the Court in *Carolene Products* joined, the Court in *Graham* merely stated that "classifications based on alienage . . . are inherently suspect" because "[a]liens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." 403 U. S., at 372.

As Mr. Justice Frankfurter so aptly observed:

"A footnote hardly seems to be an appropriate way of announcing a new constitutional doctrine, and the *Carolene* footnote did not purport to announce any new doctrine . . . ." *Kovacs* v. *Cooper*, 336 U. S. 77, 90–91 (1949) (concurring opinion).

Even if that judicial approach were accepted, however, the Court is conspicuously silent as to why that "doctrine" should apply to these cases.

The footnote itself did not refer to "searching judicial inquiry" when a classification is based on alienage, perhaps because there was a long line of authority holding such classifications entirely consonant with the Fourteenth Amendment. The "national" category mentioned involved legislative attempts to prohibit education in languages other than English, which attempts were held unconstitutional as a deprivation of "liberty" within the meaning of the Fourteenth and Fifth Amendments. These cases do not mention a "citizen-alien" distinction, nor do they support a reasoning that "nationality" is the same as "alienage."

The mere recitation of the words "insular and discrete minority" is hardly a *constitutional* reason for prohibiting state legislative classifications such as are involved here, and is not necessarily consistent with the theory

propounded in that footnote. The approach taken in *Graham* and these cases appears to be that whenever the Court feels that a societal group is "discrete and insular," it has the constitutional mandate to prohibit legislation that somehow treats the group differently from some other group.

Our society, consisting of over 200 million individuals of multitudinous origins, customs, tongues, beliefs, and cultures is, to say the least, diverse. It would hardly take extraordinary ingenuity for a lawyer to find "insular and discrete" minorities at every turn in the road. Yet, unless the Court can precisely define and constitutionally justify both the terms and analysis it uses, these decisions today stand for the proposition that the Court can choose a "minority" it "feels" deserves "solicitude" and thereafter prohibit the States from classifying that "minority" differently from the "majority." I cannot find, and the Court does not cite, any constitutional authority for such a "ward of the Court" approach to equal protection.

The only other apparent rationale for the invocation of the "suspect classification" approach in these cases is that alienage is a "status," and the Court does not feel it "appropriate" to classify on that basis. This rationale would appear to be similar to that utilized in *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164 (1972), in which the Court cited, without discussion, *Graham. Id.*, at 176 n. 14. But there is a marked difference between a status or condition such as illegitimacy, national origin, or race, which cannot be altered by an individual and the "status" of the appellant in No. 71–1336 or of the appellees in No. 71–1222. There is nothing in the record indicating that their status as aliens cannot be changed by their affirmative acts.

## II

In my view, the proper judicial inquiry is whether any rational justification exists for prohibiting aliens from employment in the competitive civil service and from admission to a state bar.

> "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland,* 366 U. S. 420, 425–426 (1961).

Before discussing this question, a preliminary reflection on the Court's opinions is warranted. Perhaps the portions of the opinions that would most disturb native-born citizens and especially naturalized citizens who have worked diligently to learn about our history, mores, and political institutions and who have successfully completed the rigorous process of naturalization, is the intimation, if not statement, that they are really not any different from aliens. The Court concludes that, because aliens residing in our country must pay taxes and some of them (but not appellant in No. 71–1336) might at one time have been subject to service in the Armed Forces, the two "groups" are indistinguishable for purposes of equal protection analysis. Compulsory military service has been ended by Congress.[2] Given the ubiquity

---

[2] Although stated in *Graham* and the instant cases that aliens are "like" citizens because they were subject to service in the Armed Services, none of the opinions considered in fact that Congress provided that aliens who in fact served honorably could expeditiously become citizens. 8 U. S. C. § 1440. The Court's reliance on the fact that some male aliens had to register for the draft and serve if called to suggest that aliens and citizens are "the same" neglects to consider this statute: aliens who served honorably were "like" citi-

of taxes in our present society, it is, in my opinion, totally unconvincing to attribute to their payment the leveling significance indicated by the Court. Is an alien who, after arriving from abroad in New York City, immediately purchases a pack of cigarettes, thereby paying federal, state, and city taxes, really no different from a citizen?

The opinion of the Court in No. 71–1222 would appear to answer this question in the negative, but it then proceeds to state that there is a difference between aliens and citizens for purposes of participation and service in the political arenas. Unless the Court means that citizenship only has meaning in a political context, the analytical approach of the Court is less than clear, hardly convincing, and curiously conflicts with the high non-political value that the Court has heretofore ascribed to citizenship. If citizenship is not "special," the Court has wasted a great deal of effort in the past. Cf. *Afroyim* v. *Rusk*, 387 U. S. 253 (1967); *Trop* v. *Dulles*, 356 U. S. 86 (1958).

These statutes do not classify on the basis of country of origin; the distinctions are not between native Americans and "foreigners," but between citizens and aliens. The process of naturalization was specifically designed by Congress to require a foreign national to demonstrate that he or she is familiar with the history, traditions, and institutions of our society in a way that a native-born citizen would learn from formal education and basic social contact. Congress specifically provided that an alien seeking citizenship status must demonstrate "an understanding of the English language" and "a knowledge and understanding of the fundamentals of the history, and of the principles and form of government, of the United

---

zens in that they demonstrated, like citizens, a commitment to our society that Congress believed warranted, other considerations aside, their immediate, formal acceptance into our society.

States." 8 U. S. C. § 1423. The purpose was to make the alien establish that he or she understood, and could be integrated into, our social system.

> "Through the system of citizenship classes sponsored by the Immigration and Naturalization Service and the local school system, the alien is aided in preparing himself for citizenship, and every effort is made to give him *fundamental and uniform knowledge of our political and social structure. In order that he may intelligently use this fundamental and uniform knowledge and so that he may be a complete and thoroughly integrated member of our American society,* the committee [House Judiciary Committee] feels that he should have a basic knowledge of the common language of the country and be able to read, write, and speak it with reasonable facility." H. R. Rep. No. 1365, 82d Cong., 2d Sess., 78 (1952) (emphasis added).

See also 8 U. S. C. § 1424, which precludes aliens who manifest certain opposition to our society or form of government from being naturalized. An alien must demonstrate "good moral character," 8 U. S. C. § 1427 (a)(3), which was intended by Congress to mean a broad "attach[ment] to the principles of the Constitution of the United States, and [disposition] to the good order and happiness of the United States." H. R. Rep. No. 1365, *supra,* at 80. See also 8 CFR § 332b (1973), detailing the cooperation between the Immigration and Naturalization Service and local schools conducting citizenship education for applicants for naturalization. The above is sufficient to demonstrate, I believe, that Congress provided that aliens seeking citizenship status prove what citizens by birth are, as a class, presumed to understand: a basic familiarity with our social and political mores and institutions. The naturalized citizen has dem-

onstrated both the willingness and ability to integrate into our social system as a whole, not just into our "political community," as the Court apparently uses the term. He proved that he has become "like" a native-born citizen in ways that aliens, as a class, could be presumed not to be. The Court simply ignores the purpose of the process of assimilation into and dedication to our society that Congress prescribed to make aliens "like" citizens.

In No. 71–1222, I do not believe that it is irrational for New York to require this class of civil servants to be citizens, either natural born or naturalized. The proliferation of public administration that our society has witnessed in recent years, as a result of the regulation of conduct and the dispensation of services and funds, has vested a great deal of *de facto* decisionmaking or policymaking authority in the hands of employees who would not be considered the textbook equivalent of policymakers of the legislative or "top" administrative variety. Nevertheless, as far as the private individual who must seek approval or services is concerned, many of these "low level" civil servants are in fact policymakers. *Goldberg v. Kelly*, 397 U. S. 254 (1970), implicitly recognized that those who apply facts to individual cases are as much "governors" as those who write the laws or regulations the "low-level" administrator must "apply." Since policymaking for a political community is not necessarily the exclusive preserve of the legislators, judges, and "top" administrators, it is not irrational for New York to provide that only citizens should be admitted to the competitive civil service.

But the justification of efficient government is an even more convincing rationale. Native-born citizens can be expected to be familiar with the social and political institutions of our society; with the society and political mores that affect how we react and interact

with other citizens. Naturalized citizens have also demonstrated their willingness to adjust to our patterns of living and attitudes, and have demonstrated a basic understanding of our institutions, system of government, history, and traditions. It is not irrational to assume that aliens as a class are not familiar with how we as individuals treat others and how we expect "government" to treat us. An alien who grew up in a country in which political mores do not reject bribery or self-dealing to the same extent that our culture does; in which an imperious bureaucracy historically adopted a complacent or contemptuous attitude toward those it was supposed to serve; in which fewer if any checks existed on administrative abuses; in which "low-level" civil servants serve at the will of their superiors—could rationally be thought not to be able to deal with the public and with citizen civil servants with the same rapport that one familiar with our political and social mores would, or to approach his duties with the attitude that such positions exist for service, not personal sinecures of either the civil servant or his or her superior. These considerations could rationally be expected to influence how an administrator in charge of a program, such as appellee Dougall, made decisions in allocating funds, hiring or dealing with personnel, or decisionmaking, or how a lower level civil servant, such as appellee Jorge, was able to perform with and for fellow workers and superiors, even if she had no direct contact with the public. All these factors could materially affect the efficient functioning of the city government, and possibly as well the very integrity of that government. Such a legislative purpose is clearly not irrational.

In No. 71–1336 the answer is not as clearcut. The States traditionally have had great latitude in prescribing rules and regulations concerning technical competence and character fitness, governing those who seek to be ad-

mitted to practice law. See, *e. g., Konigsberg* v. *State Bar of California,* 366 U. S. 36 (1961). The importance of lawyers and the judiciary in our system of government and justice needs no extended comment. An attorney is an "officer of the court" in Connecticut, a status this Court has also recognized. See, *e. g., Powell* v. *Alabama,* 287 U. S. 45, 73 (1932); *Ex parte Garland,* 4 Wall. 333, 370 (1867). He represents his client, but also, in Connecticut, may "sign writs and subpoenas, take recognizances, [and] administer oaths." Conn. Gen. Stat. Rev. § 51–85.

More important than these emoluments of their position, though, is the tremendous responsibility and trust that our society places in the hands of lawyers. The liberty and property of the client may depend upon the competence and fidelity of the representation afforded by the lawyer in any number of particular lawsuits. But by virtue of their office lawyers are also given, and have increasingly undertaken to exercise, authority to seek to alter some of the social relationships and institutions of our society by use of the judicial process. No doubt an alien even under today's decision may be required to be learned in the law and familiar with the language spoken in the courts of the particular State involved. But Connecticut's requirement of citizenship reflects its judgment that something more than technical skills are needed to be a lawyer under our system. I do not believe it is irrational for a State that makes that judgment to require that lawyers have an understanding of the American political and social experience, whether gained from growing up in this country, as in the case of a native-born citizen, or from the naturalization process, as in the case of a foreign-born citizen. I suppose the Connecticut Bar Examining Committee could itself administer tests in American history, government, and so-

ciology, but the State did not choose to go this route. Instead, it chose to operate on the assumption that citizens as a class might reasonably be thought to have a significantly greater degree of understanding of our experience than would aliens. Particularly in the case of one such as appellant, who candidly admits that she wants to live and work in the United States but does not want to sever her fundamental social and political relationship with the country of her birth, I do not believe the State's judgment is irrational.

I would therefore reverse the judgment in No. 71–1222 and affirm that in No. 71–1336.