**Allasghar KALBALI a/k/a, Ali Asghar Kalbali, Petitioner,**

v.

**The STATE of Oklahoma, Respondent.**

**No. C–81–227.**

Court of Criminal Appeals of Oklahoma.

Nov. 10, 1981.

Frank R. Courbois, Fred L. Staggs, Oklahoma City, for petitioner.

Jan Eric Cartwright, Atty. Gen., Jimmy D. Givens, Asst. Atty. Gen., Oklahoma City, for respondent.

## OPINION

PER CURIAM:

On the 10th day of April, 1981, the petitioner, Allasghar Kalbali, a/k/a Ali Asghar Kalbali, an Iranian national, appeared with counsel for sentencing. Kalbali had previously entered a plea of guilty to the charge of Grand Larceny, in the District Court of Oklahoma County, Case No. CRF–81–73, before the Honorable Joe Cannon, District Judge. The judge had previously requested a presentence report from the Department of Corrections and had provided copies of the report to the attorneys for the defendant and the State.

Mr. Fred Staggs, counsel for the defense, then requested the court to defer the imposition of the judgment and sentence based upon the favorable pre-sentence report. The judge stated that he had anticipated such a request and "had given a tremendous amount of thought on that idea", but that he did not feel that Mr. Kalbali was entitled to have Oklahoma taxpayers' money spent on his rehabilitation. The judge then noted the treatment accorded American hostages by the Iranian government. He further stated that after having communicated with the immigration officials, it was his understanding that if the defendant received a penitentiary sentence upon his release from confinement he would be deported.

Judge Cannon then advised Kalbali and his counsel that if Kalbali would voluntarily return to Iran, he would not sentence him to two (2) years' in the penitentiary; however, if the defendant failed to do so, he would be sentenced to two (2) years' imprisonment in the state penitentiary. Kalbali's bond was revoked and, at the request of defense counsel, the judge continued the sentencing proceedings in order to allow Kalbali an opportunity to confer with his counsel and purchase an airplane ticket to Iran, if he elected to take that option.

The following Monday, April 13, 1981, the defendant appeared with counsel, Mr. Frank R. Courbois, III., who offered the testimony of Mr. Kalbali.[1] He requested that the court reconsider the option which he had given the defendant, or in the alternative, allow the defendant to withdraw his plea of guilty. The judge, noting that Kalbali expressed the desire to conform to the ruling of the court, but acting in accordance with the advice of his attorney, had elected not to return to Iran. The judge declined to allow the defendant to withdraw his plea of guilty, and sentenced him to two (2) years' imprisonment. He stated that he felt the defendant, a foreign national, had come to this country and committed a serious crime, and that he did not consider him a good risk for probation; and furthermore, he was not going to spend the taxpayer's money of this State to rehabilitate somebody from Iran.

On appeal it is conceded that the defendant is guilty of a felony, and that he freely and voluntarily entered a plea of guilty while represented by counsel. It is further conceded that neither citizens nor aliens are entitled to a deferred or suspended sentence as a matter of right. However, it is contended that the district court abused its discretion in failing to consider a suspended or deferred sentence; instead, he imposed a harsher penalty solely for the reason that the defendant is an Iranian national. The

record before us amply supports that conclusion.

The Supreme Court of the United States in *Takahashi v. Fish and Game Commission*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), stated:

Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. See *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581.

\*　　\*　　\*　　\*　　\*　　\*

Moreover, Congress, in the enactment of a comprehensive legislative plan for the nationwide control and regulation of immigration and naturalization, has broadly provided:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." [May 31, 1870] 16 Stat. 140, 144, c. 114, 8 U.S.C.A. § 41, 2 F.C.A. title 8, § 41. *The protection of this section has been held to extend to aliens as well as to citizens.* (Emphasis ours) Consequently the section and the Fourteenth Amendment on which it rests in part protect "all persons" against state legislation bearing unequally upon them either because of alienage or color. See *Hurd v. Hodge*, 334 U.S. 24, 68 S.Ct. 847 [92 L.Ed. 1187]. The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide "in any state" on an equality of

---

1. Mr. Kalbali, a twenty-five (25) year old Iranian national, present in this country on a student visa, and attending the University of Oklahoma, admitted the theft of forty dollars ($40.00) worth of food from his employer, the

Holiday Inn. Upon direct questioning by his attorney, he stated that he had been advised to enter a plea of guilty, and that he understood that "he would be treated as another people."

legal privileges with all citizens under non-discriminatory laws.

See also:

*Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

The foregoing Supreme Court decisions make it clear that the refusal of the trial court to consider granting a defendant a deferred or suspended sentence, solely because he is a foreign national, is a violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution, and invidiously discriminates between an alien and a citizen.

The judgment and sentence of the trial court is VACATED and this cause is REMANDED to the District Court of Oklahoma County. In light of the expressed views of Judge Cannon, it is the further order of this Court that this cause be assigned to the Presiding Judge of the Seventh Judicial District or his designee for resentencing. At the resentencing the trial authority should afford Mr. Kalbali the same consideration given to other similarly situated defendants.

## APPENDIX

The following appeared at pages 5 thru 8 of the transcript:

THE COURT: And I just can't figure out in my heart or in my mind why the people of the United States ought to pay money to rehabilitate a person from Iran. I just can't figure that out.

I know that the laws of this country give him all the constitutional rights that the citizens of this country have. But he's been given all those rights; and brought into court; he's been out on bond.

There weren't any of the hostages out on bond over there in Iran. Not one of them. Why should I spend the people's money of this country for him? I just can't get that through my head.

Maybe I'm old-fashioned. Maybe I'm out of step with the world. But, you see, I just can't wipe it out of my mind what his country did to our people. I can't wipe that away. I remember.

They didn't get any constitutional rights over there. They didn't get any right to bail and liberty and all that, what they did. So why should I turn around and spend our money to rehabilitate him? That doesn't make sense to me.

He came over here to this country. He violated our laws. He committed a felony in this country. I'm going to use the resources of this country to rehabilitate American people, not Iranians, is what I'm going to do. If somebody wants to say different and overrule me or reverse me, that's up to them.

I'm going to give you a choice. You're either going to go to the penitentiary in McAlester; or you're catching the next airplane home, like today.

I see no reason to spend our money on you. You all didn't spend any money on our people you had over there. You held them in hostage for over a year. So why should this country bend over backwards for you. I'm not. I'm not.

You've got a choice. You catch the next airplane to Iran today, or you're going to the penitentiary. Now which one do you want it to be? I'm not talking about tomorrow. I'm talking about today. I'm going to put you in the custody of the sheriff.

Call the sheriff.

MR. STAGGS: I believe—

THE COURT: Now just a minute. I'm talking to him.

Now that's what I'm going to do. I'm going to sentence you to the penitentiary, because when you get out of the penitentiary this government will deport you to Iran the day you walk out of the penitentiary.

I don't want to punish you. I don't want to put you in jail and hold you. I'm not going to hold you like your country held our people. I'm not going to put you in the penitentiary if you go home.

But you're not going to come over here and violate our laws and then come in here and ask me to spend our money to rehabilitate you. I'm not going to do it. I don't care what you say, I'm not going to do it.

Now I'm going to sentence you to the penitentiary, unless you go home today. I'll put you in the custody of the sheriff; and let your lawyer get your plane ticket and whatever you've got, get your money and get your ticket. And I'll release you from the sheriff to go put you on the airplane.

I can do it the other way now. And you'll be deported the minute you get out of the penitentiary, because that's what they told me. But I don't want to do that to you, young man.

I don't have any personal animosity towards you. But I'm just not going to let you come over here and violate our laws, commit crimes against the people of this country.

Can you imagine what would happen to me if I went to your country and committed a crime?

THE DEFENDANT: (Nodded head up and down.)

THE COURT: They never would see me again. That would be the end of me.

THE DEFENDANT: (Nodded head up and down.)

THE COURT: So speak up. Do you want to go home? Or do you want to go to McAlester? Which one do you want to do?

THE DEFENDANT: Would you give me a chance, please?

THE COURT: Huh? No. I've told you what I'm going to do. I'm not giving you a chance. I'm going to give you the same chance your country gave our people.