Carl A. BEAZER et al., Plaintiffs,

v.

NEW YORK CITY TRANSIT AUTHOR-
ITY et al., Defendants.

No. 72 Civ. 5307.

United States District Court,
S. D. New York.

Aug. 6, 1975.

Eric D. Balber, Mark C. Morril, Elizabeth B. DuBois, Legal Action Center for the City of New York, New York City, for plaintiffs.

Edward W. Summers, Brooklyn, N. Y., and Gilbert T. Dunn, of counsel, for Transit Auth.

A. Michael Weber, Brooklyn, N. Y., Asst. Corp. Counsel, for Civil Service Commission.

William A. Roskin, New York City, for Dept. of Personnel, Civil Service Commission.

## OPINION

GRIESA, District Judge.

This is a class action against the New York City Transit Authority ("TA") and the Manhattan and Bronx Surface Transit Operating Authority ("MAB-STOA") and certain of their officials. For convenience, both of these entities will usually be referred to hereafter collectively as "the TA." Also sued are the New York City Civil Service Commission and the New York City Personnel Department and certain officials thereof.

The action challenges the blanket exclusion from any form of employment in the New York City subway and bus systems of all former heroin addicts participating in methadone maintenance programs, regardless of the individual merits of the employee or the applicant. Plaintiffs also allege that there is a similar exclusionary policy even against former heroin addicts who have successfully *concluded* their participation in a methadone program.

The amended complaint alleges that this policy violates the due process and equal protection clauses of the Fourteenth Amendment, and federal civil rights statutes, 42 U.S.C. §§ 1981 and 1983. The claim is that there is no legal basis for classifying all present and former methadone maintenance patients as unemployable for any position in the TA.

Plaintiffs also allege that the exclusionary policy has a disparate impact on blacks and Hispanics, resulting in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

Jurisdiction is invoked under 28 U.S.C. §§ 1331(a) and 1343(3) and (4), and also 42 U.S.C. § 2000e–5(f)(3).

Plaintiffs seek declaratory and injunctive relief on behalf of the class, and certain monetary relief on behalf of the named plaintiffs.

### Parties

*The Four Named Plaintiffs*

*Carl A. Beazer,* a black, is 40 years old. Beazer started working for the TA in 1960 as a subway car cleaner. He was promoted to subway conductor in 1961, and was further promoted to towerman in 1966. Beazer was dismissed from his employment on November 26, 1971 after a heroin addiction problem came to light.

Beazer had been a heroin addict since about 1952. This addiction continued during virtually the entire time of his employment by the TA, lasting until May 1971, when he entered into the methadone maintenance program of the Veterans Administration. He has been a successful participant in the methadone maintenance program since that time. The uncontradicted evidence is that, like many new methadone patients, he experimented briefly with the resumption of heroin during the early days of his methadone treatment, but he has been entirely free of heroin or other illicit drug use for over three years. Beazer ceased using methadone in November 1973.

Following his dismissal from the TA, Beazer has been steadily employed—first as a counselor in the Detoxification Program of the Veterans Administration, then as a supervisor with the Addiction Research and Treatment Corp. (engaged in drug rehabilitation work) and now as a Division Chief with an organization known as Wildcat Services, which employs methadone patients to perform building maintenance work.

The TA's Impartial Disciplinary Review Board made a finding that Beazer was handling his job at the TA competently at the time of the termination proceedings, while he was participating in the methadone program. Beazer was nevertheless terminated for violation of the TA's rule against narcotic usage.

Beazer's employment in his various positions since leaving the TA appears to have been in all respects satisfactory. Beazer was formerly married but is divorced.

*Jose R. Reyes,* an Hispanic, is 29 years old. Reyes was employed by the TA in 1968 as a Maintainer's Helper—Group B (Mason), and in 1970 was promoted to Ventilation and Drainage Maintainer. Reyes was dismissed on January 20, 1972, after a medical examination showed evidence of the use of methadone.

Reyes was a heroin user from about 1961 until February 1971, when he enrolled in a methadone maintenance program at St. Claire's Hospital. This program is under the supervision of the Beth Israel Medical Center. The uncontradicted evidence is that Reyes has been a satisfactory participant in the methadone maintenance program. Reyes is still maintained on methadone, although he is in the process of withdrawing.

Following his dismissal from the TA, Reyes was employed in the methadone maintenance program of Mount Sinai Hospital. At present he is a full-time student at Fordham University. Reyes is married and has two children.

*Malcolm Frasier,* a black, is 31 years old. In February 1971 Frasier applied for a position as a Bus Operator with MABSTOA, but was rejected because his driver's license had been suspended. Frasier applied for the same position again in early 1973. However, in March 1973, when Frasier reported for processing he disclosed that he was a methadone maintenance patient. He was therefore rejected for the position of Bus Operator. Frasier also applied at about this time for the position of Bus Cleaner, but in April 1973 was rejected because of his former methadone use.

Frasier used heroin from about 1968 until his entry into the Mary Scranton Foundation methadone maintenance program in October 1972. He was a successful participant in this program, and terminated the use of methadone in March 1973.

From about 1964 to early 1974 Frasier was employed as a truck driver and a taxicab driver. Since early 1974 Frasier has been a shipping clerk for Baker, Knapp & Tubbs Furniture Co.

*Francisco Diaz,* an Hispanic, is 40 years old. In 1970 Diaz applied at the TA for the position of Maintainer's Helper—Group D (Sheet Metal). Diaz was rejected when he disclosed that he was a methadone maintenance patient.

Diaz was a heroin user commencing about 1950 until he entered the methadone maintenance program of Beth Israel Medical Center in December 1968. Diaz continues to participate in the methadone program.

Out of the four named plaintiffs, Diaz is the only one about whom any genuine question has been raised regarding his conduct while on the methadone program. Various clinical notes indicate suspicions of illicit narcotics use and alcohol use.

However, Diaz has a long record of stable employment. From 1962 until 1973 he was employed as a sheet metal worker. Since 1973 he has been employed as a helper in a commercial bakery. There is no indication of any deficiency in Diaz's performance in either job. Diaz is married and has a wife and children.

### The Class

Basically the class represented by the named plaintiffs consists of all those persons who have been, or would in the future be, subject to dismissal or rejection as to employment by the TA on the ground of present or past participation in methadone maintenance programs.

At one point in the proceedings there was consideration as to whether the class should be expanded to cover former heroin addicts who had become drug-free without the use of methadone. However, it has been agreed by all parties, with the concurrence of the court, that the class should not include this latter group.

### Defendants

The TA is a public benefit corporation organized under the laws of the State of New York. The TA operates the subway system of New York City and certain bus lines in the city.

MABSTOA is also a public benefit corporation organized under New York law, and is a subsidiary of the TA. It operates certain bus lines in New York City.

Defendant William J. Ronan was chairman of the TA and MABSTOA from March 1968 until May 1974.

Defendant David Yunich succeeded to the above positions in May 1974.

Defendants William L. Butcher, Lawrence R. Bailey, Harold L. Fisher, Constantine Sidamon-Eristoff, Donald H. Ellito, Edwin G. Michaelian and Mortimer Gleeson, along with defendant Yunich, constitute the total membership of the TA and the directors of MABSTOA.

Defendants Frederic B. Powers and William A. Shea were members of the TA and were directors of MABSTOA at the time this action was originally filed, and were subsequently succeeded by defendants Michaelian and Sidamon-Eristoff.

Defendant Wilbur B. McLaren is Executive Officer in charge of labor relations and personnel for the TA.

Defendant Louis Lanzetta is Medical Director of the TA.

Also joined as defendants are the Civil Service Commission of the City of New York and the Personnel Department of the City of New York; Harry I. Bronstein, Chairman of the Civil Service Commission and Director of the Personnel Department; and David Stadtmauer and James W. Smith, members of the Civil Service Commission.

In the case of all individuals, the amended complaint names also their "successors in office."

### Defendants' Policy Regarding Methadone

It is the general policy of the TA that no person using narcotic drugs may be employed. Rule 11(b) of the TA's Rules and Regulations provides:

"(b) Employees must not use, or have in their possession, narcotics, tranquilizers, drugs of the Amphetamine group or barbiturate derivatives or paraphernalia used to administer narcotics or barbiturate derivatives, except with the written permis-

sion of the Medical Director—Chief Surgeon of the System."

Methadone is regarded as a narcotic within the meaning of Rule 11(b). It is stipulated that no written permission has ever been given by the Medical Director for the employment of a person using methadone.

The effect of this policy is that, if it is revealed that a current employee of the TA is a user of methadone, he will be discharged, or if an applicant for employment is a user of methadone, he will not be employed. This policy applies to all positions in the TA regardless of whether they are operating or nonoperating positions. Moreover, the policy operates as an absolute exclusion—no consideration being given to individual factors such as recent employment history, successful adherence to a methadone program, or evidence of freedom from heroin use.

The situation is not entirely clear with respect to the policy of the TA regarding persons who have successfully concluded participation in a methadone program. The reason that the policy is not fully crystalized is that the question has not arisen in practice to any appreciable extent. It is clear that a relatively recent methadone user would be subject to the blanket exclusionary policy. However, the TA has indicated that there might be some flexibility with respect to a person who had once used methadone, but had been free of such use for a period of five years or more. But even on this point, there is no official directive indicating that the person would be considered for employment.

The reasons given by the TA as a basis for this policy will be dealt with in detail later in this opinion. They can be summarized now as follows. Methadone maintenance, as a treatment for heroin addiction, has been developed relatively recently. The TA contends that the use of methadone in place of heroin is merely the substitution of one narcotic for another. The TA asserts that methadone maintenance treatment fails to a significant degree in remedying the basic problems of heroin addiction—with the result that a methadone maintenance patient embodies the underlying character defects which caused him to turn to heroin in the first place, and that there is a substantial risk that such a person, while on methadone, will revert to heroin or turn to other drugs or alcohol abuse. The TA contends also that there are significant adverse physiological effects from methadone itself, which would impair the performance of such person as an employee even if he faithfully refrained from heroin or other illicit drugs or alcohol abuse. The TA further contends that its operations involve such serious problems of safety, both with respect to the public and to the employees, that they cannot prudently employ present or past methadone patients. Finally, the TA argues that there is no satisfactory way of screening the reliable methadone patient from the unreliable, so that it is administratively necessary to have a blanket exclusionary policy.

### Summary of Conclusions

I have concluded that the blanket exclusionary policy of the TA against methadone maintenance patients is constitutionally invalid. Plaintiffs have more than sustained their burden of proving that there are substantial numbers of persons on methadone maintenance who are as fit for employment as other comparable persons.

No one can have the slightest doubt about the heavy responsibilities of the TA to the public, including their duty respecting the safety of millions of persons who are carried on its subways and buses. However, in my view, the blanket exclusionary policy against persons on methadone maintenance is not rationally related to the safety needs, or any other needs, of the TA.

I have concluded that the policy is the result of a misunderstanding by the TA regarding the nature and effects of methadone maintenance. I do not say this in any spirit of criticism. The in-

formation about methadone maintenance in the public domain is all too fragmentary and confusing. Myths and misconceptions abound. On the other hand, the trial of this case has afforded a unique opportunity to explore in depth the somewhat controversial issues surrounding methadone. A balanced and realistic view of the subject is possible as a result.

I should note that after about six days of trial the parties advised me that they were virtually finished with the presentation of their evidence. However, I was concerned about what appeared to be a disproportionately one-sided array of proof. Plaintiffs had introduced the testimony of an impressive group of experts, corroborated by laboratory and other tests, to the effect that a former heroin addict properly "stabilized" on methadone is free of undesirable narcotic effects and is entirely normal as regards mental and physical capabilities. The evidence demonstrated that methadone maintained persons were successfully employed in jobs of many kinds.

As against this, the TA had brought forward a single expert witness, a pharmacologist, to present theories about certain adverse characteristics of methadone. However, the knowledge and experience of this witness regarding methadone maintenance were so limited that his testimony was of little value. The TA called its personnel director and medical director, who both testified to certain theories they held regarding methadone maintenance. However, these officials naturally lacked the depth of expertise possessed by plaintiffs' witnesses on this subject.

The situation raised a serious question as to whether all sides of the problems involved in the case had been thoroughly explored, or whether any negative aspects of methadone and methadone maintenance programs existed that had not been presented. I therefore requested the attorneys for the parties to submit proposals for further witnesses. The result was an additional nine days

of trial at which exhaustive effort was made to probe the relevant questions with experts of varying points of view.

The picture which emerges from all the evidence is basically this. There are some 40,000 persons in New York City on methadone maintenance. It is, at present, the most widely used method for rehabilitating heroin addicts. Among these 40,000 persons on methadone maintenance there is a great variation (as there is in the population as a whole) with regard to characteristics such as educational qualifications, employment skills and background, anti-social behavior, alcohol usage, and abuse of illicit drugs. But the crucial point made so strongly by plaintiffs' witnesses was never convincingly challenged—that methadone as administered in the maintenance programs can successfully erase the physical effects of heroin addiction and permit a former heroin addict to function normally both mentally and physically. It is further proved beyond any real dispute that among the 40,000 persons in New York City on methadone maintenance (as in any comparable group of 40,000 New Yorkers), there are substantial numbers who are free of anti-social behavior and free of the abuse of alcohol or illicit drugs; that such persons are capable of employment and many are indeed employed. It is further clear that the employable can be identified by a prospective employer by essentially the same type of procedures used to identify other persons who would make good and reliable employees. Finally, it has been demonstrated that the TA has ways of monitoring employees after they have been hired, which can be used for persons on methadone maintenance just as they are used for other persons employed by the TA.

This proof applies with equal, if not greater, force to those former heroin addicts who have successfully completed participation in a methadone program.

I have therefore concluded that the present blanket exclusionary policy of the TA against employing, or consider-

ing for employment, any past or present methadone maintained person regardless of his individual merits, is unconstitutional.

### Facts

#### Heroin

It will be important to understand the differences between methadone and heroin.

Heroin is a narcotic which is generally injected into the bloodstream by a needle. It is a central nervous system depressant. The usual effect is to create a "high"—euphoria, drowsiness—for about thirty minutes, which then tapers off over a period of about three or four hours. At the end of this time the heroin user experiences sickness and discomfort known as "withdrawal symptoms." There is intense craving for another shot of heroin, after which the cycle starts over again. A typical addict will inject heroin several times a day.

There are variations in the severity of heroin addiction. For instance, it is possible for a heroin addict to take moderate amounts of the drug—just enough to avoid the withdrawal symptoms, without producing the euphoric highs. Such a person might function somewhat normally. However, this type of controlled heroin addict is very rare.

#### Methadone

Methadone is a synthetic narcotic and a central nervous system depressant. If injected into the bloodstream with a needle, it can produce basically the same effects as heroin.

Methadone has been used, under medical controls, as a pain killer. Also, methadone is used in "detoxification units" of hospitals to take addicts off of heroin. This is done by switching a heroin addict to methadone and gradually reducing the doses of methadone to zero over a period of about three weeks. The patient thus detoxified is drug free. Moreover, it is hoped that the program of gradually reduced doses of methadone leaves him without the withdrawal symptoms, or the "physical dependence" on a narcotic.

It appears that these detoxification programs, without a follow-up of further treatment are frequently unsuccessful, and that there is a high incidence of reversion to heroin. There are various theories about why this is so. Persons involved in programs such as Phoenix House and Odyssey House take the view that the reason that "physical" detoxification is not enough is because the underlying causes of heroin addiction are psychological problems and problems of life-style, which must be addressed in an appropriate manner.

On the other hand, there is a body of opinion which holds that, in addition to psychological and life-style problems, there are some physical problems from heroin addiction which persist after any short-run detoxification. This theory is that there is a physical discomfort or a physical dependence, which requires treatment. The major treatment method thus far devised is maintenance on stable doses of methadone. Such methadone maintenance is feasible because of the following characteristics of methadone.

We are dealing here with methadone taken orally. When taken orally, methadone is radically different from heroin. Whereas heroin moves rapidly in and out of the bloodstream causing violent highs and lows, oral methadone passes into the body tissues, and then is fed into the bloodstream gradually over a period of twenty-four hours or more. There is a relatively constant or stable level of methadone in the blood during this time. When a person is first on oral methadone he may experience narcotic effect in some degree—such as euphoria, and drowsiness. But it has been found that the body will become tolerant to oral methadone rather quickly, and that after this tolerance is achieved, any narcotic effect ceases. The evidence is that a person who has attained this tolerance can take a constant dose of methadone once a day and has neither the eu-

phoric effects nor the withdrawal symptoms associated with heroin.

The question arises as to what purpose there is in taking methadone if no euphoria or pleasurable effects are obtained. According to the expert evidence, the purpose is two-fold: *First,* methadone produces what is called a "blockade" or "cross-tolerance," which prevents a methadone user from experiencing any "high" from injecting heroin. It should be noted that this cross-tolerance does not apply when the methadone user attempts to use substances other than heroin—such as cocaine, barbiturates, amphetamines, or alcohol. *Second,* experience indicates that former heroin addicts may have some symptoms of discomfort or drug dependence for a fairly long period of time after discontinuing the use of heroin. The nature of these symptoms obviously varies to some extent from individual to individual. The precise cause of such symptoms is a matter of some debate—as to whether the cause is physical or psychological or a combination of both. These matters do not require a detailed exploration in this opinion. The evidence convinces me that the symptoms we are talking about are what would generally be considered medical or physical symptoms. Clearly they are not, in and of themselves, mental or psychiatric deficiencies or disorders. In any event, the uncontradicted evidence is that these symptoms are cured by stable dosage of methadone.

*Origin of Methadone Maintenance Programs*

It is well known that methadone maintenance, as a treatment for heroin addiction, originated with Dr. Vincent Dole and his wife, Dr. Marie Nyswander, at Rockefeller University. Dr. Dole testified in this case.

In 1963 Dr. Dole became Chairman of the New York City Health Department's Health Research Committee on narcotics, and entered into an intense research activity regarding narcotics. One of his projects was to determine if narcotics addicts could be stabilized on medically controlled doses of drugs. In other words, could the radical highs and lows be eliminated by some constant dosage of a drug? He found that this was impossible with short-acting injectible drugs such as heroin and morphine. However, the results were radically different when he tried oral methadone. Drs. Dole and Nyswander found through their experiments that heroin addicts could become stabilized on constant doses of methadone with the results described earlier in this opinion.

A demonstration methadone maintenance program was set up at the Beth Israel Medical Center. Twelve patients were admitted in the first group and by 1965 about 200 patients were being treated. At this time Dr. Harold R. Trigg, who was head of the Narcotics Detoxification Service at Beth Israel, became interested in the methadone maintenance project. Dr. Trigg later became, and still is, Chief of the Methadone Maintenance Program of the Beth Israel Medical Center. At the present time Beth Israel treats about 6500 persons on methadone maintenance in 35 separate clinics. Dr. Trigg testified in this case.

As indicated earlier in this opinion, there is substantial agreement that many persons attempting to overcome heroin addiction have psychological or life-style problems which reach beyond what can be cured by the physical taking of doses of methadone. Dr. Dole and his associates were acutely aware of this. Consequently the pattern which was developed in the Beth Israel program and in methadone maintenance programs subsequently established was to provide a variety of services including counseling, medical and psychiatric care, educational and vocational guidance, and recreational facilities. Certain minimum standards with respect to these services are set forth by both federal and state regulations.

*Current Methadone Maintenance Programs*

Today there are approximately 75,000 persons under methadone maintenance treatment in the United States, of which about 40,000 are in New York City.

The methadone maintenance programs are of two basic types. The first type is referred to as "public" or "semi-public." These programs are non-profit. The second type is referred to as "private." These programs are operated for profit.

The five major public or semi-public methadone maintenance programs in New York City are:

(1) The Beth Israel program, referred to above, with 35 clinics treating 7100 patients;[1]

(2) A program administered by the City of New York with 39 clinics treating 12,400 patients (hereafter referred to as "the City program");

(3) A program administered by the Bronx State Hospital and the Albert Einstein College of Medicine, with 7 clinics treating about 2400 patients;

(4) A program operated by the Addiction Research and Treatment Center (ARTC) with 6 clinics treating about 1200 patients; and

(5) A program operated by the New York State Drug Abuse Control Commission (DACC), with 8 clinics treating about 1100 patients.

The total number of patients treated in public or semi-public programs is about 26,000. It appears that these programs are financed almost entirely by federal, state and city funds.

There are about 25 private programs in New York City treating a total of about 14,000 patients.

All methadone maintenance programs throughout the United States are required to comply with regulations of the Food and Drug Administration, promulgated December 15, 1972, 21 C.F.R. § 130 *et seq.* Programs in New York State are required to comply, in addition, with the somewhat more stringent regulations of the New York Drug Abuse Control Commission, promulgated in May 1974, 14 N.Y.C.R.R., Part 2021.

Compliance with these regulations is monitored by the DACC, which acts on behalf of the state and also on behalf of the federal government by contract.

Both the federal and state regulations set forth requirements for the types of persons who can be admitted to the program, the kinds of services which must be rendered, the staffing of the programs, the days and hours of operation and record keeping, controls on the administration of methadone, and tests for illicit drug usage.

A number of the clinics under the aegis of both the Beth Israel and the City programs are located in hospitals not operated either by the City or by Beth Israel. These arrangements are pursuant to contract. The standards for the clinics are set by Beth Israel and the City. The hospitals provide facilities and assist in various ways such as consultation in the hiring of personnel. Fourteen of the Beth Israel clinics and 36 of the City clinics are operated in this way. Among the hospitals where City methadone maintenance clinics are located are New York Hospital, Knickerbocker Hospital, Harlem Hospital, Bellevue Hospital, Elmhurst Hospital and Beekman Downtown Hospital.

*The Course of Methadone Maintenance Treatment*

In order to become enrolled in a methadone program, a person is supposed to have been a heroin addict for at least two years. In other words, the sole purpose of these programs is for the cure of heroin addiction.

---

1. The figures given in this section are from the testimony of Dr. Frances Gearing, of the Columbia University School of Public Health. These figures are as of December 31, 1974.

When an applicant is accepted for a program, the first step is to have him detoxified from heroin and from any other illicit drug abuse or alcohol abuse. For this purpose a short period of in-patient treatment at a hospital is usually required.

In connection with this process, a stable or constant dosage of methadone is worked out to be administered to the patient over a protracted period of time. Among methadone maintenance programs there are basically two theories regarding maintenance on stable doses. There are what are termed "high dose" programs, where the dosage is in the range of 80–100 milligrams per dose. Beth Israel is a high dose program. The philosophy of such programs is to give the patient sufficient methadone to make sure that any physical dependence or craving for heroin will be eliminated and to make sure that the blockade or cross-tolerance against heroin is effective. The proponents of such programs further believe that there should be no pressure upon methadone patients to discontinue methadone; that there is nothing intrinsically wrong or harmful about the usage of methadone over an indefinite period of time; that such usage is essentially medicinal; and that the sole criterion which should be used to determine whether or not the patient should be on methadone is his ability to function properly in society.

The "low dose" programs have a somewhat different philosophy. Their proponents believe that the proper goal for a methadone maintenance program should be to have the patient on the program as short a time as possible, that the proper goal of a methadone maintenance program should be detoxification, not only from heroin, but also from methadone. They believe that detoxification from low doses of methadone is easier than from high doses, and thus favor the low doses. Addiction Research and Treatment Corp., which has clinics in Brooklyn and Harlem, conducts a low dose program.

However, except for the differences noted above, the basic functioning of the high dose and low dose programs is similar. After detoxification from illicit drug abuse, the patient commences taking constant doses of methadone each day. Under federal and state regulations, a patient is required to appear at the clinic and take his dosage of methadone in the presence of a staff member at least six days a week for the first three months. The seventh day's dose may be taken at home. After a certain period of time, if the patient's conduct is satisfactory, he may be permitted to reduce his attendance at the clinic and take more of his daily doses at home. However, even after two years of participation in a program, the patient is required to make a minimum of two visits to the clinic each week.

The patient must participate in counseling—at first on a daily basis, and less frequently as time goes on.

The patient must be observed in various ways to determine whether he is abusing drugs or alcohol. It appears that methadone patients, at least in the first stages of treatment, sometimes attempt to return to heroin. But the uncontradicted evidence is that the blockade or cross-tolerance is indeed effective, and that persons on methadone are no longer able to find satisfaction in heroin; and then generally stop trying. However, for one reason or another, such as a possible lapse in methadone dosage, a patient might occasionally revert to heroin in a serious fashion. In any event, urine tests for heroin usage are required by federal and state regulations to be administered at least once a week.

The evidence further shows that, by the use of a somewhat different chemical analysis, a urine test will reveal other drugs such as barbiturates, and amphetamines, although detection of cocaine is difficult. Federal regulations require urine tests once a month for evidence of drugs other than heroin. It further appears that clinics such as Beth

Israel take steps to make sure that their patients are frequently observed to determine whether there is any drug abuse revealed by behavior or appearance. These clinics also watch closely for signs of excess drinking.

These clinics also take precautions against abuse of methadone. One problem is the possibility that a patient may take excessive quantities of methadone, over and above the dose prescribed by the clinic. It is conceivable that he might do this by obtaining methadone on the black market, or by taking two or three days' doses at one time where the clinic has given him methadone to be administered outside the clinic. A different type of problem is the possibility that a methadone patient might sell his methadone outside the clinic, instead of taking it himself.

Various precautions are taken to guard against either type of abuse—including strict control of the issuance of methadone doses, observations of the behavior of the patients, and observation of any signs of manipulation (*i. e.*, stories by the patient of losing his methadone, etc.).

It appears that during the first few months that a patient is on a methadone maintenance program, it will become reasonably apparent whether he is genuinely determined to rid himself of illicit drug usage and is conducting himself accordingly. There is a certain proportion of methadone maintenance patients who do *not* thus conform—who are showing evidence of illicit drug use or excessive drinking, who make little or no attempt at rehabilitation, who loiter or otherwise engage in undesirable conduct. These are what those experienced in the field call the "visible" cases. Many of them drop out of the programs within the first few months or the first year. Many of them are discharged. In some cases such patients are kept on in the hope of improvement. But their situation is evident to clinic personnel. As far as employment is concerned, the evidence indicates convincingly that the clinic personnel are not likely to refer or recommend such persons.

For patients who do perform satisfactorily on the program, treatment will generally continue a year or more. The longest term of methadone maintenance treatment revealed in the record in the present case is four years. Often, however, the patient reaches a point where he desires to terminate his usage of methadone. He believes that he can do without it, and wishes to avoid the trouble of frequent appearances at the clinic. In such a case, the dosage of methadone is reduced to zero over a period of time. Many patients, after terminating usage of methadone, function normally without it. Some find that they return to methadone maintenance.

### Physical Effects of Methadone

Two basic questions arise with respect to the employability of methadone maintenance patients. The first is whether methadone maintenance patients will have any narcotic effects or other side effects related to the usage of methadone. The second is whether the patient will return to heroin, or will abuse other illicit drugs or alcohol. Both of these questions have been referred to in earlier portions of this opinion. However, they merit further discussion.

As an initial proposition, one might assume that methadone, being a narcotic and a central nervous system depressant such as heroin, must inevitably produce narcotic effects such as euphoria, drowsiness, inattention, departure from reality, and slowing of reactions.

The TA's expert witness, Dr. Vincent Lynch, a pharmacologist, testified that methadone "undoubtedly" occupies parts of the brain which would affect "cognitive faculties, the ability to respond voluntarily in certain situations." Dr. Lynch also testified that even in a person who has been maintained on a stable dose of methadone for a period of time, the person's functions would be inhibited for a short period of time each day

after taking his dose of methadone. Dr. Lynch disputed the idea that a methadone patient could really be "stabilized" on a constant dose. His opinion was that a tolerance would be attained which would make methadone ineffective to prevent the discomfort or physical dependence causing the heroin craving.

Considering Dr. Lynch's testimony in the light of the evidence as a whole, I find Dr. Lynch's testimony to be too speculative to be of much value. For instance, Dr. Lynch's methadone "tolerance" theory was not based on any tests with human beings, and appears to ignore the marked differences between methadone and other drugs such as heroin.

The overwhelming weight of the evidence is to the effect that a methadone maintenance patient can perform normally, and that undesirable side effects are lacking.

It appears that during the twelve years that have elapsed since the initial investigations of methadone maintenance, there has been a remarkably intensive effort to test and observe methadone maintenance patients and to gather statistics about their performance. Dr. Robert DuPont, Jr., Director of the Special Action Office of Drug Abuse Prevention in The White House, and Director of the National Institute on Drug Abuse in the Department of Health, Education and Welfare, testified that there had been a "vast array of tests" regarding the ability to drive vehicles, ability to maneuver the hands, reaction to signals, sleep patterns, sexuality, and that the evidence is "that the person who is maintained on methadone performs within the normal range of expectation of a normal population."

The detailed results of a number of such tests were introduced into evidence in this action, and indicated normal behavior by methadone maintenance patients.

Dr. Vincent Dole testified regarding his many years of observation of persons stabilized on methadone, and stated:

"Q. Doctor, has your physiological research or that of your colleagues indicated that there is any disruption of the cognitive faculties when a person is maintained on methadone?

"A. No. On the contrary, we have much data by now that the cognitive and other emotional and intellectual faculties of the mind are normal. We have done the type of tests that you already probably had reported through Dr. Gordon's laboratory on specific things such as IQ measurements and various other perceptual tasks. What probably is more important to this point is now a very large record with some tens of thousands of patients who have gone to school and had high grades, who have accomplished much in responsible jobs, in business and elsewhere."

Regarding the possibility of a methadone maintenance patient obtaining heroin-type euphoria, Dr. Dole testified that many patients have come into methadone treatment centers "on the mistaken theory that they were going to get a free ride and a free euphoria for a long time" and that such patients have very soon discovered "that they do not get euphoria."

Dr. Paul Cushman, Jr., Director of the Methadone Maintenance Clinic of St. Luke's Hospital (a clinic operated under the direction of the Beth Israel Medical Center) testified that he had seen thousands of methadone maintenance patients and that they are basically "indistinguishable" from "comparable non-drug people." Dr. Cushman testified that as to characteristics such as alertness, ability to handle challenges, ability to perform work such as electrical circuit work, welding, mechanical repairs, and so forth—there is "no difference be-

tween a normal subject and the methadone maintained patient after he has been stabilized on his methadone."

Dr. Irving Lukoff, of the Addiction Research and Treatment Corporation, has been performing research for some years with respect to the results of methadone maintenance. Dr. Lukoff contributed much of the factual material for an article entitled "Methadone, The Forlorn Hope" by Edward J. Epstein in the Summer 1974 issue of The Public Interest. This article raised a number of questions about methadone maintenance, including the problem that many persons who commence maintenance programs drop out or are discharged.[2] For purposes of the present case, the important point is that persons who remain in a methadone maintenance program for a substantial period of time are the result of a "self-cleansing" process which goes on in the program, according to Dr. Lukoff. Dr. Lukoff testified that he has seen hundreds of patients maintained on methadone who function normally in terms of all obvious signs, and that they are "functioning the way everybody else does."

Dr. Seymour Joseph, Deputy Commissioner of the New York State Drug Abuse Control Commission, testified that when a person is stabilized on methadone there are no deficiencies in day-to-day conduct such as ability to think and perform required functions.

Dr. Joyce Lowinson, who was responsible for the first methadone maintenance unit under Dr. Vincent Dole, and since 1968 has been in charge of the methadone maintenance program at Bronx State Hospital, testified that participants who are stabilized on methadone function normally, and that there is "no way of distinguishing a person on methadone from a person who is not on methadone" except by means of a urine or blood test revealing the presence of the substance. In contrast to Dr. Lynch's testimony that a person stabilized on methadone will feel a narcotic effect for a period of time immediately after taking his daily dose, Dr. Lowinson testified that such a person, when he takes the daily dose of methadone, "is in no way changed, and is no different after he has taken his medication." Dr. Lowinson contrasted the taking of the dose of methadone with what results from the injection of heroin, where there is the immediate "rush" or "high."

There was also considerable evidence on the question of whether methadone maintenance produces undesirable "side effects." The evidence is that, during the time patients are being brought up to their constant dosage of methadone (a period of about six weeks), there may be complaints of drowsiness, insomnia, excess sweating, constipation, and perhaps some other symptoms. After the patient is stabilized, he becomes tolerant to methadone and the side effects diminish and largely disappear. However, some side effects may persist. For instance, in a group of methadone maintenance patients studied by Dr. Mary Kreek of Rockefeller University, 48% were experiencing excessive sweating; 17% had constipation; 16% had insom-

2. Methadone maintenance has received both criticism and commendation in articles, books —and an occasional television item. The Epstein article questions certain of the medical theories espoused by Dr. Dole and his associates and questions certain statistics sometimes used to show the favorable results of methadone maintenance. For instance, the Epstein article cites certain "evidence" and authorities against the "blockade" theory of methadone.

Of course, my findings and conclusions in the present case must rest on the testimony and other evidence introduced in the case, rather than on the views of authors expressed in articles, where these authors would not be subject to cross-examination about the extent of their knowledge, etc. But I would note a statement quoted with approval in the Epstein article by Dr. Avram Goldstein, director of the Addiction Research Laboratory at Stanford:

"Nothing I have said should be interpreted as 'debunking' methadone or derogating its importance. It is a fantastically effective tool for bringing addicts into a new and helpful kind of therapeutic environment."

nia; 22% had some libido problem. However, the evidence is clear that these conditions do not particularly differentiate this group from other parts of the population. Moreover, except in rare cases, such conditions have no effect upon employability. For instance, the constipation problems could be cured by a common laxative.

The TA referred at the trial to a "package insert" which is required by FDA regulations to be included with methadone sold to physicians, hospitals, and clinics. The package insert contains a description of various matters, including warnings about possible side effects. The package insert states in part:

"*Use in Ambulatory Patients—* Methadone may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as driving a car or operating machinery. The patient should be cautioned accordingly.

"Methadone, like other narcotics, may produce orthostatic hypotension in ambulatory patients."

There was extensive inquiry at the trial about the significance of this warning, justifying in my view, the following findings: Warnings in package inserts such as this one tend to include every *possible* adverse effect that might occur under *any* circumstances of usage. Although the side effects referred to in this warning might occur where methadone is being used as a pain killer or for some similar purpose, such effects do not occur in a person stabilized on a constant dose of methadone.

To summarize my conclusions on this subject, I find that a person maintained on a constant dose of methadone can perform normally by every standard that relates to employability, and that, except in rare cases, there are no side effects making such a person incapable of being employed. These, of course, are propositions which plaintiffs have consistently espoused. They have been tested in every way that the participants of this trial could think to test them.

The overwhelming weight of the evidence is in their support.

### Illicit Drug and Alcohol Abuse

A prospective employer of a methadone maintenance patient would naturally question the chances that such a person would revert to heroin, or use other illicit drugs. One aspect of the problem is the possibility that the methadone maintenance patient, unable to find further satisfaction in heroin, might substitute other drugs or alcohol.

The TA contends that these are risks of large proportions among methadone maintenance patients. The TA relies on a study performed by Chambers and Taylor in 1970 to the effect that, in a group of methadone patients in Philadelphia who had been under treatment for at least 24 months, 97.6% of them were found to use an illicit drug at least once during a one-month period. The TA relies on the testimony of Dr. Mitchell S. Rosenthal, director of Phoenix House, which operates a "drug free" program for the treatment of narcotic addicts—*i. e.*, no methadone or other drug is used following the initial detoxification. In the opinion of Dr. Rosenthal, "cheating" by methadone maintenance patients with illicit drugs had been shown by studies to be in the magnitude of 70%. The only specific study Dr. Rosenthal was able to refer to was the one by Chambers and Taylor.

On the other hand, Dr. Rosenthal testified that a patient in a methadone maintenance clinic is monitored so that his use or non-use of drugs can be detected by an employer in a way that does not exist for other employees who might be abusing drugs.

Plaintiffs presented evidence that the conditions under which the Chambers and Taylor study was performed bore no resemblance to the conditions that exist today in a properly conducted methadone maintenance program. Moreover, plaintiffs presented statistics and estimates indicating that the use of illicit drugs among methadone mainte-

nance patients involves a relatively small, and generally visible, minority.

Before going into plaintiffs' evidence on this point, certain observations are necessary. Although fairly detailed information was presented about the major public methadone maintenance programs, very little specific information was provided regarding the private clinics. Obviously, neither side wished to prolong the case to the extent of subpoenaing witnesses from all, or even some, of the 25 private clinics in New York City. There was general testimony to the effect that the private clinics might tend not to be as well run as the public programs. There was also testimony indicating that the quality and performance of the patients in private clinics might be worse than that of patients in the public programs, although the director of one of the public programs, ARTC, testified that ARTC draws from the hardest of the hard core addicts. The information about the private clinics is not really sufficient to permit a conclusion that statistics about matters such as drug abuse would be either better or worse for the private clinics than for the public programs.

In any event, since the public programs treat about 26,000 out of the 40,000 methadone patients in New York City, statistics and other information drawn from these public clinics cover the majority of methadone maintenance patients in New York City, and will be relied upon with this in view.

The public clinics appear to be conscientious in accumulating information about drug abuse. They also note instances of problem drinking. In the case of drugs, this information comes from the periodic urine tests. With regard to drinking, it appears that the program personnel are trained to be sensitive to signs of such a problem.

The witnesses in this case basically agreed that methadone maintenance patients will sometimes attempt to "challenge" their methadone—i. e., attempt some usage of heroin. This usually happens during the first weeks on a program, although it can also happen later. Plaintiffs' witnesses were emphatic in their view that these attempts by a person stabilized on methadone to return to heroin fail because of the blockade or cross-tolerance effect. For instance, Dr. Beny J. Primm, Executive Director of ARTC testified:

".   .   . a patient who is on methadone would have no reason whatsoever, once stabilized, to again shoot heroin. I want that absolutely clear. It is just pharmacologically impossible for him to realize any feelings from the heroin because of the cross tolerance of methadone and heroin."

However, this blockade or cross tolerance effect does not relate to drugs other than heroin, or to alcohol.

Dr. Trigg of Beth Israel testified that about 5,000 out of the 6,500–7,000 patients in his clinics have been on methadone maintenance for a year or more. He further testified that 75% of this 5,000 are free from illicit drug use.

Dr. Bihari of the City's methadone maintenance program testified that, for patients who have been in that program more than six months only 4% have signs of heroin usage in urine tests, and 11% have signs of other drugs. Dr. Bihari testified that 6% of the City's patients have alcohol problems.

Dr. Lowinson of the Bronx State Hospital program stated that, for patients who have been in that program six months or more, 6–7% show some evidence of heroin usage in urine tests, and another 12% show evidence of usage of barbiturates or other sedative or hypnotic drugs. Dr. Lowinson testified that 5% of the patients have alcohol problems.

Dr. Primm of ARTC testified that, among his program's patients who have been in treatment a year or more, 60–70% are adjusted sufficiently that they are free from any drug or alcohol problem. Dr. Primm testified that his program's patients are drawn from the "hardest of the hard core" addicts.

Dr. Kreek testified about a study relating to 129 of the first patients in methadone maintenance programs. At the time of the study these patients had been in programs from three to about five years. There was evidence of continued intermittent heroin abuse in the case of 2 out of the 129. There was evidence of intermittent use of other drugs in the case of 6 out of the 129, but these other drugs included barbiturates and valium. Dr. Kreek noted that valium is the second most frequently used drug by the general population—second only to aspirin. There was no indication of any cocaine use among the 129.

I conclude from all the evidence that the strong majority of methadone maintained persons are successful, at least after the initial period of adjustment, in keeping themselves free of the use of heroin, other illicit drugs, and problem drinking.

*Employment*

There is impressive evidence about successful employment among methadone maintenance patients. Seventy percent of the Beth Israel patients who have been in the program for a "period of time" are employed. Sixty percent of those who have been in the Bronx State Hospital program over a year are employed. In the City program, 45% are employed in paying jobs, 11% are homemakers, and 6% are full-time students. Dr. Primm of ARTC, testified that 35% of his program's total population (including those in the methadone program and those in a drug free program) are employed. The percentage is greater for the methadone program alone. In the DACC program, 80% are employed.

A statistical study by Dr. Frances Gearing of the Columbia University School of Public Health shows that for four groups of patients studied, the percentage occupied in gainful employment, homemaking, or school attendance after one year were 59%, 63%, 41% and 34% respectively.

Consolidated Edison hires methadone maintenance patients. The policy of Consolidated Edison is to consider for employment a former heroin addict who has performed satisfactorily on a methadone maintenance program for a minimum of one year. Con Ed has hired about 100 former addicts under this policy. Such employees have satisfactorily occupied a variety of positions at Con Ed including monitoring various types of controls, and work on street crews. Con Ed advances such employees along normal promotional lines in accordance with their performance and skills, the sole exception being that former addicts are excluded from any nuclear facility in accordance with Con Ed's understanding of the law. Con Ed believes that its experience with former addicts participating in rehabilitation programs has been successful. A special study of the work of 13 Beth Israel patients at Con Ed indicates that their performance was as good or better than that of the average Con Ed employee.

The evidence further indicates that methadone maintenance patients have been satisfactorily employed as sheet metal workers, truck drivers, taxi drivers, drill press operators, teachers, electricians, mechanics, draftsmen, clerks, cashiers, bank tellers, and a great variety of other positions. Local employers who are now hiring methadone maintenance patients at least on a trial basis are Chemical Bank, New York Life, Metropolitan Life, J. C. Penney, McGraw-Hill, Seagram, Columbia Presbyterian Hospital, New York Telephone Company, New York Off-Track Betting Corporation, and others. An official of the Sheetmetal Workers International Association testified that his organization is bringing methadone maintenance patients into its apprenticeship program, and that they are performing work such as welding, using heavy machinery, and working on scaffolding.

Dr. Joseph testified that there is a large segment of methadone mainte-

nance patients who become "non-visible", in that they are performing well and are free of serious problems. With regard to employment, he testified:

"We have people in methadone maintenance programs who are performing any and every type of service in this city and state, ranging from being outstanding members of the professions to laborers, going through the gamut of electricians—you name it."

According to Dr. Joseph there are thousands of such persons.

### Classification of Persons on Methadone Maintenance

There is certain other information in the record which helps give perspective on the question of employability of persons on methadone maintenance.

The witnesses from the Beth Israel program testified that about one-third of the patients in that program, after a short period of adjustment, need very little more than the doses of methadone. The persons in this category are situated fairly satisfactorily with respect to matters such as family ties, education and jobs. Another one-third of the patients at Beth Israel need a moderate amount of rehabilitation service, including vocational assistance, for a period of several months or about a year. A person in this category may, for instance, have finished high school, but may have a long heroin history and no employment record. A final one-third of the patients at Beth Israel need intensive supportive services, are performing in the program marginally, and either will be discharged or will be on the brink of discharge.

Dr. Harvey Gollance estimated that about 20% of Beth Israel's patients drop out of the program. At the Bronx State Hospital 10% of the patients are discharged during the first year.

Dr. Lukoff from ARTC described it this way. He stated that about one-third of ARTC's patients are "stereotype" addicts, who have started on heroin in their teens, and have had severe problems with family ties, education and crime. The other two-thirds of the ARTC patients are persons who started on heroin in their 20's, who tend to have finished school or military service, and who have maintained better situations with respect to family ties and employment. About 40–45% of the first third drop out in the first year of treatment. About 75–80% of the other two-thirds remain in the program.

The evidence indicates that problem patients—those who are abusing drugs or alcohol and who are not making progress in rehabilitation—are identifiable after about 3–6 months, if not sooner.

On the question of employability—many methadone patients (about 30% in the case of Beth Israel and Bronx State) are employed when they enter the programs. Others are employed within a matter of weeks. In many cases, however, the clinic personnel feel that they should wait 6–9 months or even a year before making a recommendation for employment.

### Identification of Those Employable

As a result of the evidence at the trial, there can be no real dispute about the fact that substantial numbers of methadone maintenance patients are capable of successful employment. The question remains as to how a prospective employer can identify those who will perform satisfactorily, and screen out those who are still abusing drugs or have other undesirable characteristics. There was intensive inquiry on this question at the trial.

My conclusion is that an employer such as the TA can perform this screening for methadone maintenance patients in basically the same way as in the case of other prospective employees.

The TA, like any large employer, has staff and facilities for ascertaining the mental and physical qualifications of prospective employees. The TA also has various systems for monitoring the performance of employees after they are hired. In cases where particular infor-

mation must be obtained, the TA will consult with physicians, psychiatrists, hospitals, and other sources.

The TA must always make the best determination it can as to whether the applicant will have proper work habits, and whether there is a risk of undesirable conduct such as thievery, drunkenness or narcotic usage. The TA, like any employer, does not rely on hunch, but obtains *objective evidence—i. e.,* information about performance at school, employment history, current employment record, family ties, medical or psychiatric history, criminal record, and so forth.

In this connection, it is important to note that the TA has no blanket prohibition against the hiring of persons with criminal records. Individual consideration is given to the nature of the crime, and to the question of how it might relate to the job applied for. For instance, a record of theft would be considered against a person applying to handle money. The prior criminal record would be considered in the context of recent job stability and evidence of rehabilitation.

The TA has no blanket prohibition against the employment of persons taking drugs such as tranquilizers. When evidence of such usage appears, the TA believes it should "dig a little deeper" to find out about the circumstances. Inquiry may be made with the person's doctor. Consideration is given on an individual basis.

The TA has no absolute prohibition against the employment of persons formerly confined to a mental institution or persons who have been, or are currently being, treated by a psychiatrist. The TA has psychiatrists on retainer to act as consultants where problems such as this arise. But again, the matter of employability is considered on an individual basis.

The TA does not maintain any blanket rule barring the hiring of persons with such medical problems as diabetes, epilepsy or heart disease. Individual consideration is given to applicants having these conditions. It is the policy of the TA to consider the hiring of such persons on an individual basis in light of such factors as their actual performance capabilities and the safety sensitivity of the job to which they seek appointment.

I return to the matter of objective evidence of employability, considered with respect to methadone maintenance patients. A crucial point here is that the record in this case demonstrates that there are large numbers of methadone maintenance patients who are able to provide to a prospective employer satisfactory objective evidence of employability. For instance, many methadone maintained persons can demonstrate that they have been on a reliable methadone program for a year or more; that they have faithfully abided by the rules of the program; that, according to systematic tests and observations, they have been free of any illicit drug or alcohol abuse for the entire period of treatment, excluding a possible adjustment period; that they have the necessary education or other training for the job; that they have stable family ties; and that they have a current successful employment record, and a successful work history.

In the background, of course, is the record of heroin addiction. Medical Director Lanzetta of the TA takes the view that when a man goes on heroin there is "some deficiency somewhere", which presumably persists thereafter, particularly while the person needs the "crutch" of methadone maintenance. Although there is no doubt that heroin addiction is a problem of the most severe nature, the presumption that heroin addiction invariably stems from some character defect, making a person more or less permanently unemployable, cannot be supported. The question about whether a person maintained on methadone has some defect or deficiency making him invariably a risky employee has been dealt with in detail heretofore in

this opinion. The evidence is conclusively to the contrary.

The question in the individual case is whether the methadone maintained person, despite the history of heroin addiction, is currently capable of employment. If the TA were being asked to employ a marginal or doubtful case—*i. e.,* a person who had been in a program only a short time and who had no work history or current employment record—the TA might well be justified in giving little or no consideration to such an applicant. But the TA's blanket exclusionary policy applies with equal strength to the many methadone maintained persons who, from any rational standpoint, have objectively demonstrated their capability of being employed by means of evidence of freedom from drug abuse and employment record. Moreover, the TA's policy applies not only to what are obviously its most sensitive positions—such as subway motormen, subway towermen, bus drivers—but applies to all jobs in the TA, such as clerks and car cleaners. The TA refuses to consider a methadone maintained person for employment, regardless of the evidence he presents about employability and regardless of what type of job he seeks at the TA.

I have referred a number of times to evidence of freedom from drug or alcohol abuse. The obvious source of such information is the methadone maintenance program.

In connection with obtaining information from methadone maintenance clinics, the TA makes two points: First, that some of the clinics—particularly the private ones—may not provide reliable information; and second, that the clinics may be legally prevented from giving full information to an employer regarding a patient. Neither point is of weight in the present case.

It is true that several of the witnesses indicated that there might be private clinics which could not be relied upon for accurate information about drug and alcohol abuse. Also, one of the witnesses from a "drug free" program expressed skepticism about the ability of one of the public programs—the City program —to consistently provide reliable information. On the latter point, the current director of the City program was thoroughly interrogated in this case, and the weight of the evidence is that the City program is soundly managed and reliable within the bounds of normal human fallibility. In any event, the TA has never *tried* to obtain information from even those clinics such as Beth Israel which are unanimously agreed to be reliable. Employers such as Consolidated Edison have found that they can obtain satisfactory information about methadone maintenance patients in order to make intelligent employment judgments. There is no reason to believe that the TA cannot do the same thing.[3]

With regard to the legal restrictions imposed upon a methadone clinic in the giving out of information about patients, 21 U.S.C. § 1175(a) provides that records of the treatment of any patient in a federally regulated drug abuse prevention function shall be confidential and shall be disclosed only under the circumstances authorized in § 1175(b). Subsections (b)(1) and (g) provide in effect that such records may be disclosed in accordance with the prior written consent of the patient for such purposes as are allowed in regulations issued by the Director of the Special Action Office for Drug Abuse Prevention.

3. There was some suggestion at the trial that it might be necessary or advisable to have a certification board or panel of experts to determine the employability of former addicts. But the weight of the evidence supports the proposition that an employer such as the TA can make this determination by its normal screening procedures. In the case of methadone maintained persons, the employer would naturally seek information from the program. But this is essentially no different from obtaining relevant references for other types of applicants. If the TA has legitimate doubts about the reliability of the information obtained from the program, it will accord such information little or no weight.

The applicable current regulations were issued June 25, 1975 and became effective on August 1, 1975. 42 C.F.R. §§ 2.1 *et seq.*, 40 Fed.Reg. 27802. Section 2.38 governs disclosure of information to employers. It is clear that under these regulations a methadone maintenance patient may authorize release of information to an employer or prospective employer which is relevant to questions relating to employment.

*Persons Having Terminated Methadone Maintenance*

The great bulk of the evidence in this case related to the question of the employability of persons engaged in methadone maintenance programs. There was some evidence, although not a great deal, about the characteristics of persons who have successfully *completed* a methadone maintenance program and have withdrawn from methadone.

There are indications that at times these persons will return to the methadone maintenance programs. At times such persons revert to heroin. However, it is unquestioned that there are many methadone maintenance patients who successfully withdraw from methadone and stay clear of drug abuse thereafter. Plaintiff Beazer is such a person, having ceased using methadone almost two years ago.

In any event, it would appear that there would be effective means for objectively determining the qualifications for employment of a former methadone maintenance patient. There is no rational reason for maintaining an absolute bar against the employment of these persons regardless of their individual merits.

*Policies of City, State, and Federal Governments*

The City of New York, the State of New York and the Federal Government have taken various steps to eliminate bars to public employment of methadone maintenance patients and other former addicts.

On March 22, 1972 the New York City Department of Personnel issued a policy statement approved by various City officials and by the City Civil Service Commission. The policy statement provided that a history of drug addiction shall not in itself constitute a bar to employment in any City position, except that appointments to the "uniformed services" would continue to be governed by "current medical and physical standards." The policy statement provided that where an applicant for City employment has a history of drug addiction, his case will be considered on its individual merits. The policy statement specifically provided that methadone maintenance patients should be assisted in obtaining City jobs.

This policy has had no effect on the TA, for reasons which will be described hereafter.

As to the exception for the "uniformed services," apparently the police, the firemen, and sanitation workers are included in this category. However, the evidence indicates that in fact there is no blanket exclusion of methadone maintenance patients in these departments, at least as to all positions.

The New York State Civil Service Department and Drug Abuse Control Commission have promulgated certain "Operating Principles," providing that if an applicant for State employment has a history of drug abuse, the application should be considered on its merits, although a history of drug abuse may be considered the basis for denial of appointment in "certain sensitive positions" identified by the Civil Service Department. These Operating Principles specifically provide for assistance to methadone maintenance patients seeking State employment.

In 1972 Congress passed the Drug Abuse Office and Treatment Act, which provides in part that "no person may be denied or deprived of Federal civilian employment or a Federal professional or other license or right solely on the ground of prior drug abuse." The stat-

ute goes on to state that this provision does not apply to employment in the CIA, the FBI, or other similar agencies. 21 U.S.C. § 1180(c). Although the statute does not expressly so state, it would appear that a person successfully participating in a methadone maintenance program would be within the protection of the statute.

*Mechanics of TA's Exclusion Policy*

Positions in the TA consist of so-called "city-wide titles" and also titles which are unique to the TA. The city-wide titles are positions such as secretary, clerk, motor vehicle operator, which involve basically the same work in the TA and in City agencies. The TA has 3,400 employees in city-wide titles.

The New York City Civil Service Commission has adopted medical standards for city-wide titles in the TA, and these standards specify that a person who is successfully participating in a recognized methadone maintenance program may be employed. It is conceded that the TA avoids the effect of this rule by invariably passing over any methadone patient when applicants for city-wide title jobs at the TA are chosen from the Civil Service eligibility lists. The TA has the right under Civil Service Law § 61 to choose any one of the top three applicants on the list at the time of a particular selection for a job.

With respect to the employment titles at the TA other than city-wide titles, the TA has its own medical standards which it has written, although they have been formally promulgated by the Civil Service Commission. These standards provide that an applicant may be rejected for a history of drug abuse, and it is clear that the TA uniformly rejects all persons with a history of drug abuse who are participating in methadone maintenance programs.

*Positions in the TA*

The TA contends that it cannot afford to take what it considers the risks of employing present or past methadone maintained persons, except possibly those who have been successfully withdrawn from methadone for several years. The TA emphasizes that employees such as subway motormen have an immediate and heavy responsibility for the safety of large numbers of persons. The TA argues that many of its employees must work unsupervised throughout the wide geographical area covered by the TA system. Indeed, the TA's officer in charge of personnel, Wilbur McLaren, testified that "most of our people are literally unsupervised." The TA further contends that its jobs are attended by unusual hazards—such as the risk of a maintenance man being hit by a subway in a tunnel.

There can be little doubt about the unique sensitivity involved in jobs such as that of subway motorman. Despite the existence of various automatic safety devices to protect against the consequences of mistakes, the subway motormen and subway towermen (who control certain subway signals) and other similar employees of the TA must be persons of maximum alertness and competence.

One inevitable question raised by the present case is: "Do you want a methadone patient driving a subway train?" One answer to this question is that, under concededly valid rules of the TA, a person cannot become a subway motorman except by promotion from some other position in the TA. This means that a methadone maintained person seeking his first job with the TA *could not apply* to be a motorman. No one can be considered for the position of motorman until he has demonstrated satisfactory job performance *at the TA* in some other position for a period of a year or eighteen months, or more. The same is true for the position of subway towerman. As to subway conductors (who control the opening and closing of subway doors), although technically this title is an "entry level" position, in fact the last two competitions for the position—in 1972 and 1975—were open only to existing TA employees seeking promotion. The position of bus driver is open to

new applicants. In any event, as I will describe later in this opinion, I believe that it would be constitutionally permissible for the TA to refuse to employ present methadone maintained persons as motormen, conductors, towermen, bus drivers, and in similar operating positions.

But the essential point here is that the TA's exclusionary policy against methadone maintained persons is applied *not merely* with respect to the uniquely sensitive jobs such as motorman and other comparable positions, but is applied with respect to *every* category of work within the TA. It is perfectly clear that large numbers of the employees in the TA perform work essentially similar to the type of work done in other businesses and industries where methadone maintained persons appear to be successfully employed.

The TA (including MABSTOA) employs approximately 47,000 persons. It hires about 3000 employees annually. For various purposes, the TA divides its jobs into operating and non-operating positions. The principal operating positions, with the numbers of persons involved are:

| | |
|---|---|
| Subway Motormen | 3,300 |
| Subway Conductors | 3,200 |
| Subway Towermen | 600 |
| Bus Operators | 5,200 |
| | 12,300 |

However, the TA has almost 400 other job titles, largely in the non-operating category. The following are a few examples of non-operating titles, listed with the number of employees involved:

| | |
|---|---|
| Accountant | 25 |
| Assistant Accountant | 29 |
| Architect | 5 |
| Assistant Architect | 33 |
| Junior Architect | 5 |
| Civil Engineer | 79 |
| Civil Engineer Draftsman | 27 |
| Assistant Civil Engineer | 207 |
| Junior Civil Engineer | 58 |
| Cashier | 32 |
| Clerk | 378 |
| Senior Clerk | 286 |
| Collecting Agent | 145 |
| Bookkeeping Machine Operator | 49 |
| Claim Examiner | 60 |
| Computer Operator | 7 |
| Keypunch Operator | 57 |
| Messenger | 12 |
| Railroad Caretaker | 229 |
| Railroad Porter | 1162 |
| Railroad Stockman | 72 |
| Railroad Stock Assistant | 103 |
| Railroad Watchman | 162 |
| Stenographer | 44 |
| Senior Stenographer | 48 |
| Typist | 190 |
| Senior Typist | 33 |

There are other non-operating TA employees, which will be described in more detail hereafter.

The TA's contention that most of its employees work basically without supervision is somewhat belied by the large number of supervisory positions listed among the approximately 400 titles of TA employment. For instance, there are 21 kinds of foremen. There are a total of 1413 foremen in these 21 categories. There are 40 categories of employment at the TA bearing the title "Senior" attached to some type of job—such as Senior Computer Operator, Senior Engineer. There are 12 types of "Superintendents" and 29 types of "Supervisors."

Most of the TA non-operating employees are under some direct supervision, or at least report to a foreman or supervisor who determines that the employees are fit for duty.

All TA employees (except perhaps at the very high levels) are on probation for the first six months of their employment. This applies to both new employees and ones who have been promoted from another TA job. During probation there is close scrutiny by a supervisor.

For various purposes the TA considers certain positions as "critical" or safety-sensitive, and other positions as

"non-critical." For instance, periodic physical examinations are given to persons in various critical positions such as subway motormen, subway conductors and bus operators. As will be discussed in more detail hereafter, the TA treats an employee with an alcohol problem differently depending on whether the position is deemed critical or non-critical. Again, the principal critical categories are motormen, conductors and bus operators, although there are non-operating jobs, such as operating cranes and handling high voltage equipment, which are deemed to be critical. A non-critical job is defined by chief personnel officer McLaren, in connection with the alcohol issue, as one where "drinking would not directly relate to passengers' safety or overly expose other employees." The TA will permit a person having enough of a drinking problem to require treatment by the TA's alcoholic counselling service to remain on non-critical jobs. Such jobs include all the so-called "City-wide" titles (3400 persons); car cleaners (950 persons); and apparently a majority of the jobs involved in repairing subways and buses (total 3000 persons), maintaining subway track, structures and tunnels (total 6800 persons), and manning the subway stations (total 5600 persons).

Certain categories of employment bear further discussion. These are: (1) office work; (2) maintenance of subway cars and buses; (3) maintenance of track, structures and tunnels; (4) work in subway stations.

*(1) Office Work*

The total number of office workers is over 2,000. These include 1200 persons in various clerical and secretarial titles. Most of the office employees work in the two main offices of the TA at 370 Jay Street, Brooklyn, and the World Trade Center in Manhattan. They mainly work a daytime shift and are under normal office-type supervision.

*(2) Maintenance of Subway Cars and Buses*

There are about 6,600 employees involved in the maintenance of subway cars and buses.

This category includes 950 car cleaners.[4] About half of these do the daily sweeping and picking up of the cars. The other half do the washing and other types of cleaning which occur on certain schedules. The sweeping and picking up are carried out at the two main subway yards at Coney Island and at 207th Street, and at 13 inspection stations. The washing and other cleaning work is carried out in the two main yards.

Most of the car cleaning is done at night. While some car cleaners work alone, generally they work in groups of two or more and are supervised by a foreman.

One of the objections of the TA to hiring methadone maintained persons for car cleaning is that various cleaning agents are used which might be toxic under certain circumstances, and that the effect of these cleaning agents might be "potentiated" by methadone. Dr. Vincent Lynch testified to this. However, Dr. Lynch admitted that the question of whether there might be some harmful effect depended upon the actual conditions of work at the TA, such as the concentration of the substances and the amount of fresh air or ventilation. Dr. Lynch stated that he had tried to find out something about these conditions from the TA, had been unable to do so, and actually knew nothing about the conditions. I therefore can give no

4. Apparently this category includes both cleaners of subway cars and cleaners of buses, since there is no separate category of Bus Cleaner given in the list of employment titles furnished to the court. However, plaintiff Frasier applied for the position of "Bus Cleaner" in 1973. It will be assumed that Bus Cleaners perform essentially the same functions as Car Cleaners.

weight to the claim about "potentiation" of the effects of cleaning agents.[5]

Another category of positions involves repair and parts replacement for subway cars. There are 3,000 TA employees in this category. These employees perform body work, mechanical and electrical work and painting. They work mainly in shops in the daytime, and generally in groups supervised by foremen.

The TA argues that this subway repair work involves unusual hazards because of the need to manipulate heavy machinery and power tools. But the uncontradicted evidence is that methadone maintained persons are performing successfully in comparable industrial jobs.

In any event, plaintiffs are not suggesting that just anyone on methadone be thrown into working with metal benders and boring machines. The person must be *qualified* for the job. For instance, in the case of a Car Maintainer A (Body Work), he would be required under TA regulations to have substantial training and experience in such skills as fabrication of steel assemblies, welding and cutting of heavy gauge metal, forging, and the use of the necessary tools and power equipment. If a present or past methadone maintained person came to the TA and could demonstrate these qualifications, could demonstrate a current satisfactory employment record in this type of work, and could verify his freedom from illicit drugs for a substantial period of time, plaintiffs urge that he deserves to be considered for a job opening on his merits. The evidence supports this proposition.

As to repair of buses, there are about 1000 employees engaged in such work,

divided about equally between day and night shifts. The work is mainly done in garages under the supervision of foremen, and is of a somewhat lighter nature than what is involved in the repair of subway cars. However, again there are requirements of extensive training and experience.

As already indicated, the TA deems many of the jobs connected with the repair and maintenance of subways and buses as "non-critical," so that a person with an alcohol problem may be permitted to continue in his job while rehabilitation attempts are being made. Car cleaners are considered non-critical.

### (3) Maintenance of Track, Structures and Tunnels

This category of work is referred to by the TA as "maintenance of way." There are about 6800 employees involved. These employees lay and repair track, work on road beds, and also do all the other repair and maintenance work for tunnels, stations and elevated rail structures. They maintain the signals and also the equipment for supplying the power to the subway system. These employees include carpenters, masons, plumbers, electricians and metal workers. Also included are the persons who work on drainage pumps and ventilation fans—the type of work done by plaintiff Reyes.

Obviously, the work of these employees is spread throughout the subway system. However, these employees usually work in groups ranging from two or three to larger gangs. A foreman will supervise a single group, or several small groups, as appropriate.

---

5. The TA has suggested that the cleaning work at the yards involves substantial danger because cleaners need to walk throughout the yards and might encounter third rails carrying 600 volts of electricity. In connection with this case I was taken on a tour of certain parts of the TA system, which included a visit to the Coney Island yard at night. We started at the outskirts of the yard, and crossed seemingly endless numbers of rails and third rails before we

finally approached some car cleaning operations. From later testimony, however, it appears that the car cleaners themselves approach their work far more conveniently. After arriving at the yard by subway or automobile, they walk via a parking lot and sidewalk to the foreman's office in the inspection shop, and then to the cars to be cleaned, usually crossing two or three tracks at most.

Maintenance of Way employees include 1500 trackmen, who work on the rails, ties, plates, ballast and "subgrade." They usually work in gangs of ten men or more under a foreman.

The TA argues that many Maintenance of Way employees are subjected to unique hazards involved in working in tunnels or on elevated structures where trains are passing, and where the third rail must be constantly avoided.

However, here again the TA has set high qualifications for the more sensitive jobs. Positions such as carpenter, mason, signal maintainer, and power distribution maintainer, can only be gained through promotion from helpers or trainees in those categories. A new employee will enter as a helper or trainee, and even the latter are required to have appropriate experience. The helper or trainee will work under close individual supervision for a year or more.

Again, many of the jobs connected with the maintenance of subway track, tunnels and structures are deemed "non-critical," so that a person with an alcohol problem may be permitted to keep working during rehabilitation efforts.

### (4) Work in Subway Stations

There are about 5,600 employees involved in this category. They consist mainly of about 4,100 railroad clerks who sell the tokens; about 1,100 railroad porters, who sweep and clean the stations; and about 140 turnstile maintainers, who repair the turnstiles.

These employees work largely alone at the various subway stations throughout the system. However, it is clear that the railroad porter does not occupy a position of unique sensitivity. The TA points out that the railroad clerk and the turnstile maintainer are positions requiring honesty and alertness, and that these employees are sometimes robbed. But the evidence shows that methadone maintained persons are serving as bank tellers, and as cashiers in the Off-Track Betting offices. It is not reasonable to presume that they could *never* qualify for employment as railroad clerks or turnstile maintainers.

Railroad clerks, railroad porters and turnstile maintainers are deemed to be non-critical employees in the application of the policies regarding alcohol.

### TA Policy Regarding Alcohol

Some further explanation is necessary regarding the TA's policy about alcohol. The TA's handling of drinking problems is far more lenient than anything suggested in this case regarding methadone maintained persons. Plaintiffs are seeking in this action consideration for employment as to persons whose heroin addiction is *in the past* and who are, at the time they apply to the TA, demonstrably free from drug or alcohol abuse.

Although the TA currently refuses to consider such persons for employment, the TA is willing to continue in employment a substantial number of persons with existing alcohol problems.

A TA employee is subject to discipline if he is found drinking on the job or unfit for duty because of drinking done before he came to work. There was some confusion among the TA witnesses as to exactly what discipline would be imposed. But basically, it appears that, at the time of the first offense, someone in a critical position such as motorman would be moved to a non-critical position such as platform conductor; and a person in a non-critical position would, upon the first offense, be given a three-day suspension and then returned to his job. If the TA believes that the employee has a drinking problem that needs counselling or treatment, he is sent to the TA's Employee Counselling Service, which exists to deal with problem drinkers. He may then be requested to attend Alcoholics Anonymous, or to go to a hospital if necessary. If hospital treatment occurs, an effort is made to have him return to work as soon as possible, because the TA feels "that oc-

cupational therapy at the time is a very essential part of their recovery," according to the testimony of Joseph Warren, Director of the Employee Counselling Service.

There are currently about 2300–2400 TA employees attending the counselling service.

As already indicated, persons having drinking problems sufficient to require extended counselling and treatment with the counselling service are permitted to be employed in a wide variety of jobs at the TA including office work, laying of track, cleaning and repair of subway cars, and so forth.

It is interesting to note that a person with a drinking problem may actually be permitted to function in positions such as subway motorman under certain circumstances. If a motorman realizes he has an alcohol problem and comes to the counselling service, or his family reports to the counselling service, he will undertake counselling and treatment on a confidential basis, according to Mr. Warren. This is treated as "highly classified information." The man's supervisor is not apprised, nor apparently is the man taken off the job, until and unless the supervisor detects some failure of performance.

### Conclusions of Law

*Applicable Law*

■ There is no basic dispute among the parties as to the constitutional doctrines which apply to the present case. A public entity such as the TA cannot bar persons from employment on the basis of criteria which have no rational relation to the demands of the jobs to be performed. To do so is a violation of both the due process and equal protection clauses of the Fourteenth Amendment. This applies to new applicants for employment, and to existing employees threatened with termination.

Decisions dealing with the basic doctrines are *Cleveland Board of Education*

*v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Baker v. Columbus Municipal Separate School District,* 329 F.Supp. 706 (N.D.Miss. 1971), *aff'd,* 462 F.2d 1112 (5th Cir. 1972).

In the *LaFleur* case the Court held invalid under the due process clause certain rules requiring teachers to take extended leaves of absence beginning with the fourth or fifth month of pregnancy. Justice Stewart, writing for the majority, held that such rules have the effect of creating irrebuttable presumptions of physical inadequacy, and that the constitution requires more individualized determination. Justice Powell concurred in the result, although he disagreed with the irrebuttable presumption theory. Justice Powell would permit certain classifications or rules relating to pregnant teachers, provided they were narrower and rationally related to a legitimate employment purpose.

*Sugarman v. Dougall, supra,* held unconstitutional, as violating the equal protection clause, a provision in the New York Civil Service Law that no person would be eligible for state employment in the "competitive class" if not a United States citizen. Justice Blackmun, writing for the majority, made it clear that the state might, "on the basis of an individualized determination," validly refuse public employment because of noncitizenship in certain types of positions where this factor bore some rational relationship to the demands of the position. However, "a flat ban" on the employment of aliens could not withstand scrutiny under the Fourteenth Amendment.

The Supreme Court's decision in *LaFleur, supra,* was anticipated by the Second Circuit decision in *Green v. Waterford Board of Education,* 473 F.2d 629 (2d Cir. 1973). In this case emphasis

was laid upon the fact that a pregnant teacher was treated differently from persons having other forms of disability. The court stated (473 F.2d at 634–5):

> "Why the Board should choose, by means of an inflexible rule, to manifest particular concern with the health of a pregnant woman, but not, for example, with the health of a teacher (male or female) recuperating from a heart attack is nowhere explained."

### Application to the Present Case

▮ Under the above authorities, I hold that the TA's blanket ban against the employment of all present and past methadone maintained persons in *any* position in the TA is a violation of the due process and equal protection clauses of the Fourteenth Amendment.

It is perfectly clear that there are substantial numbers of present or past methadone maintained persons who would be capable of performing many of the jobs at the TA. Individual consideration, or narrower rules rationally related to certain classifications of jobs, are constitutionally required.

The lack of a reasonable basis for the present policy of the TA is particularly evident from the markedly different treatment given to problem drinkers— persons presenting greater risks than those members of the plaintiff class for whom employment is sought. *See Green v. Waterford Board of Education, supra.*

I recognize that there are differences of opinion as to the merits of methadone maintenance as a treatment for heroin addiction. For one thing, there is a conscientious body of opinion strongly objecting on philosophical grounds to the long-term use of one drug to combat the effects of another drug. However, as plaintiffs' experts point out, one might also challenge on philosophical or moral grounds the use of alcohol and the use of other "licit" drugs by large segments of the population. Obviously, the constitutional rights of methadone maintained persons cannot be decided on the basis of these considerations.

▮ I wish to stress certain things *not* compelled by my holding. The TA is not required to hire any present or past methadone maintained person where there is a legitimate reason to question the person's ability or competence—including a legitimate reason to believe that the person is abusing illicit drugs or alcohol. The TA is not required to rely on references from methadone clinics or programs where there is reason to doubt the reliability of such information. The TA is not prevented from making reasonable rules and regulations about methadone maintained persons—such as requiring satisfactory performance in a program for a period of time such as a year, or forbidding methadone maintained persons employment in sensitive categories such as that of subway motorman, subway conductor, subway towerman, bus driver, and jobs dealing with high voltage equipment. As in *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the problem is the TA's flat ban, which goes beyond any rational or legitimate needs of the TA, and excludes persons just as qualified for employment as many who are hired by the TA.

▮ One other question to be dealt with at this point relates to the suggestion at the trial that there may be methadone maintained persons who are working for various employers, including the TA, where the employers are unaware of that fact. Surely there is nothing which constitutionally prevents the TA from inquiring of its employees, or applicants for employment, whether they are or were on methadone maintenance programs. Upon such inquiry, the employees or applicants would be obligated to disclose the facts.

Returning to the main issue, I hold that plaintiffs and their class are entitled to relief under the Fourteenth Amendment and under 42 U.S.C. § 1983.

### The § 1981 and Title VII Claims

Since I have decided that relief is warranted as described above, I need not

reach the claims of racial discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

*The "City" Defendants*

Although plaintiffs have shown a right to relief in this case against the TA, MABSTOA, and their officials who have been sued, there is no showing of any wrongdoing or any need for relief as against the New York City Civil Service Commission or the New York City Personnel Department, or any officials connected with these two entities.

*Relief to be Granted*

In connection with the relief to be granted, there are two subjects to be covered: First, the relief for the named plaintiffs; second, the relief for the class.

With respect to the named plaintiffs, the basic error committed by the TA was determining these persons' status on the basis of the TA's blanket exclusion of present and past methadone maintained persons. The TA will be directed to re-examine the employability of each of the four named plaintiffs without regard to this invalid policy. The TA will then submit its conclusions to the court. The court will then finally determine whether any of the named plaintiffs should be reinstated or hired, and what rights to back pay there are, if any.

With respect to the class, plaintiffs are directed to submit a proposed permanent injunction based upon the principles announced in this opinion, and the TA defendants are to review and comment upon plaintiffs' proposal.

I have in mind that the injunction cannot provide for the detailed handling of all situations which might arise. Obviously, no one knows at the present juncture exactly who will apply for what job. The injunction should contain certain basic directions and guidelines. Thereafter the court will retain jurisdiction for a period of time to implement the injunction.